IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JAMES CHARLES FUDGE                                    PETITIONER


v.                              5:06CV00183 JLH-JFF


LARRY NORRIS, Director,
Arkansas Department of
Correction                                             RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Judge J. Leon Holmes. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than eleven (11) days from the date of the findings and recommendations. The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## DISPOSITION

Before the Court is the Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Magistrate Judge undersigned recommends that Petitioner's petition be dismissed with prejudice.

## BACKGROUND

**I. State Court Proceedings.**

**A. Trial.**

In January of 1999, Petitioner was tried by a jury in Pulaski County Circuit Court on the charge of capital murder of his wife, Kimberly Fudge. Petitioner was represented at trial by two deputy public defenders, Bret Qualls and Tammy Harris. The evidence received at trial demonstrated that on the evening of December 24, 1997, Kimberly Fudge attended a party at the North Little Rock, Arkansas, apartment of her neighbor,

Deborah Wilson. Trial Transcript, Exhibit L (docket entry # 32) to Respondent's Response (docket entry # 16), pp. 1292-1294.  Kimberly lived in the apartment beneath Deborah's apartment. Tr. 1291.  During the party, Petitioner entered Deborah's apartment and told Kimberly that it was time for her to go home. Tr. 1294-1295. Kimberly left with Petitioner. Tr. 1295. Sometime later, Deborah exited her apartment to talk to some people in a car parked outside. Tr. 1295. As she was walking down the stairs, she saw Petitioner sitting on the stairs. Tr. 1295.  Deborah asked Petitioner where Kimberly was, and he replied that she was in her apartment. Tr. 1295. After talking to the people in the car, Deborah approached Petitioner, who was still sitting on the stairs, and asked him if Kimberly was still in her apartment. Tr. 1296.  Petitioner replied, "Yeah." Tr. 1296. Deborah went to Kimberly's apartment to ask if Kimberly was coming back to the party. Tr. 1296. Deborah found Kimberly "sitting on the couch, balled up." Tr. 1296.  Deborah asked Kimberly if she was coming back to Deborah's apartment. Tr. 1297.  Kimberly replied, "Yes." Tr. 1297.

Later in the evening of December 24, 1997, or the early morning hours of December 25, 1997, Kimberly Fudge came running to Deborah's apartment. Tr. 1298, 1324-1325. Kimberly acted nervous and scared, and Deborah asked Kimberly what was wrong. Tr. 1298.  Kimberly stated, "We've got to go. We've got to go." Tr. 1298-1299. Kimberly and Deborah left in a car, picked up a friend, Donald Brinkley, and went to the house of another friend. Tr. 1299.  While at the house, Deborah Wilson noticed that Kimberly had a cut on her lip and bruises on her neck. Tr. 1300-1301. The cut had blood running out of it. Tr. 1301. Deborah asked Kimberly, "What happened to your lip?" Tr. 1300-1301.  Kimberly replied that Petitioner had cut her lip, choked her, and

forced her to have sex. Tr. 1301-1302. Deborah Wilson testified that Kimberly was acting scared and nervous at the time. Tr. 1300-1302.

Donald Brinkley testified that on the night of December 24, 1997, or the early morning hours of December 25, 1997, Kimberly Fudge came to his residence. Tr. 1572, 1575.  Brinkley testified that Kimberly was frightened and stated that she and her husband "were in some kind of confrontation." Tr. 1575.  Brinkley noticed that Kimberly had a small cut on her lip. Tr. 1575.

On the evening of December 26, 1997, while Deborah Wilson and Kimberly Fudge were in Deborah's apartment, Petitioner came to the door and asked for Kimberly. Tr. 1305-1308.  Deborah told him that he was wrong for what he had done to Kimberly. Tr. 1310. Petitioner replied, "You know I didn't mean to do that to [her]." Tr. 1310. Kimberly left with Petitioner. Tr. 1310-1311. Later that evening, Deborah Wilson went to Kimberly's apartment and knocked on the door. Tr. 1312-1313. No one answered. Tr. 1313.  Deborah went into the apartment and noticed that the lights were off and that the television was on. Tr. 1313. Kimberly was not in the apartment. Tr. 1313. Deborah also noticed that Kimberly's car, a black 1987 Chevrolet Celebrity, was gone. Tr. 1312-1313. The evening of December 26, 1997, was the last time that Deborah Wilson saw Kimberly Fudge. Tr. 1314.

On December 27, 1997, Kimberly Fudge was supposed to go to her mother's house and drop off some church shoes. Tr. 1268-1269, 1277.  When Kimberly failed to show up, her daughter, Krystal Wade, called Kimberly's apartment looking for her. Tr. 1269. Petitioner answered the phone. Tr. 1269.  When Krystal asked for her mother, Petitioner replied, "If you are looking for her, you will never find her." Tr. 1269.

-4-

On the night of December 27 or December 28, 1997, Petitioner went to the home of Robert Williams in Hensley, Arkansas, and told Williams he had "cut a dude" in the East End and was going to Redfield, Arkansas, to wash the blood off of his car. Tr. 1422-1426. On December 28, 1997, Petitioner went to Pilot Travel Center, a truck stop in Galloway, Arkansas, and told a friend, Jerome Jones, that he was looking for a ride to Dallas. Tr. 1396-1398. On the morning of December 29, 1997, Petitioner returned to the truck stop, driving Kimberly Fudge's black 1987 Chevrolet Celebrity. Tr. 1399. Petitioner told Jerome Jones he had found a ride to Dallas and offered Jones the car, stating that he was about four months behind on the payments. Tr. 1401-1402. Jones agreed to take the car, and Petitioner gave him the keys. Tr. 1402-1403. Petitioner then left in a truck with a truck driver. Tr. 1402-1403.  Jerome Jones called his brother, Carl Jones, who came to the truck stop and picked up the car. Tr. 1403-1404. Carl found bleach and washing powder in the trunk of the car.  Tr. 1442.  He also noticed that "the floor mat" was in the passenger seat and that the mat was wet. Tr. 1442.  When Carl removed the mat, he noticed a red stain on the passenger seat. Tr. 1442-1443.

Lucille Taylor, Petitioner's aunt, testified that after Christmas Day of 1997, she saw Petitioner driving a black car, which she thought belonged to his wife. Tr. 1663-1664.

Lisa Channell, a forensic serologist at the Arkansas State Crime Laboratory, found blood in numerous locations in Kimberly Fudge's car, including on carpet from the front seat area and on a location above the small rear window on the passenger side. Tr. 1524-1527. Phillip Rains, a forensic biologist at the Arkansas State Crime

Laboratory, who performed a DNA analysis on a cutting from the carpet, a swab from the rear window area, and a known blood sample from Kimberly Fudge, testified that the analysis showed that the DNA types from the carpet and swab matched the DNA types from the known blood sample of Kimberly Fudge. Tr. 1558-1559.

On January 5, 1998, the body of Kimberly Fudge was found in the woods near Woodson in Pulaski County, Arkansas, less than three-quarters of a mile from Robert William's house in Hensley. Tr. 1424, 1491-1496, 1589-1591. Dr. Steven Erickson, a medical examiner at the Arkansas State Crime Laboratory, testified that Kimberly Fudge was stabbed repeatedly in the chest and abdomen and suffered a significant blunt force injury to the back of her head. Tr. 1336, 1341-1344.  She received three stab wounds to her heart, as well as wounds to one of her lungs, liver, stomach, and right leg. Tr. 1344-1345.  Kimberly Fudge's right lower lip was swollen, but there was no observable disruption of the surface of her lip. Tr. 1343. Dr. Erickson testified that the cause of Kimberly Fudge's death was multiple stab wounds and blunt force injuries. Tr. 1376.

Pursuant to a warrant issued by the Pulaski County Sheriff's Department, police in Portland, Oregon, arrested Petitioner on January 26, 1998, and transported him to the Portland Police Bureau. Tr. 1674-1675. Later that day, two Portland police officers, Sergeant David Rubey and Sergeant Kris Ferrell, interviewed Petitioner. Tr. 1677. Sergeant Rubey testified at Petitioner's trial that during the interview Petitioner stated, among other things, that during the fall of 1997 through the holidays of 1997 the only occasion that he drove Kimberly Fudge's black Chevrolet Celebrity was a couple of

nights prior to Christmas Eve, 1997. Tr. 1691-1692. Rubey further testified that Petitioner stated that the last time he had contact with Kimberly Fudge was Christmas Day, 1997.  Tr. 1688.

After deliberating, the jury found Petitioner guilty of capital murder and sentenced him to death by lethal injection.

**B.  Motion for New Trial.**

After Petitioner's trial, his counsel[1] filed a motion for new trial on Petitioner's behalf. Tr. 262-265.  Counsel argued, *inter alia*, that (1) the *Miranda*[2] rights form used by Portland, Oregon, police "does not inform any suspect that he may stop questioning at any time, nor is a suspect informed that he is entitled to have an attorney appointed at no cost," (2) the process used by police violated *Miranda* because police never informed Petitioner that "he had a continuous opportunity to exercise his right to remain silent" and did not make any reference to his indigency in connection with informing him that an attorney would be appointed for him, and (3) Petitioner's statements to police were involuntary because they were obtained by a promise of leniency, *i.e.*, police told him that "with domestic abuse situations, the charges could run a potential gamut from self-defense and therefore no charge at all, up to and including aggravated murder." Tr. 263-264. A hearing on the motion for new trial was held on March 2, 1999. Tr. 1922-1944. On the same day, the circuit court entered a one-sentence order denying the motion. Tr. 268.

---

[1] Bret Qualls.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**C.  Direct Appeal.**

Petitioner appealed his capital murder conviction to the Arkansas Supreme Court.  Counsel,[3] on behalf of Petitioner, raised the following grounds for reversal in the appellate brief (Exhibit C to Respondent's Response (docket entry # 16), pp. 371-394):

1.      The evidence was insufficient to sustain the verdict;

2.      The trial court erred in refusing to instruct the jury on second-degree murder;

3.      The trial court erred when it permitted the prosecution to adduce testimony from State's witnesses Deborah Wilson and Donald Brinkley about statements Kimberly Fudge had made to them on Christmas Eve about alleged violence committed against her by Petitioner, and the trial court's admission of the statements violated  the Confrontation Clause of the Sixth Amendment;

4.      The trial court erred in admitting victim impact evidence on the grounds that such evidence is irrelevant under Arkansas's capital sentencing procedure; and

5.      The capital murder statute, Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997), is unconstitutional as void for vagueness and because of its overlap with Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997).

Petitioner filed a motion for permission to participate as co-counsel on appeal and to file a supplemental *pro se* brief. Petitioner's Petition (docket entry # 2), Document 2-3. In supplemental *pro se* briefs tendered to the Arkansas Supreme Court but not accepted for filing, Petitioner argued, *inter alia*, that Portland, Oregon, police violated his *Miranda* rights by using "deception and misconstruing information to dupe [him] of his signature," promising him leniency, failing to mention the word "waive" or "waiver," mentioning lesser charges, failing to provide him "the requested attorney,"

---

[3]  Deborah Sallings.

using a deficient rights waiver form, and disregarding his right to waiver and right to stop the interview at any time. Exhibit G to Respondent's Response (docket entry # 16), pp. 000202-000214; Petitioner's Petition, Document 2-3. He also argued that the trial court erred in admitting hearsay testimony by Dr. Steven Erickson about the "reported range of death" and about "information from a copy of a missing person's report by North Little Rock Police Department that was ruled inadmissible." Exhibit G to Respondent's Response, p. 000209; Petitioner's Petition, Document 2-3. The Arkansas Supreme Court denied Petitioner's motion for permission to participate as co-counsel on appeal and to file a supplemental *pro se* brief. *Fudge v. State*, 341 Ark. 652, 19 S.W.3d 22 (2000). The Arkansas Supreme Court rejected the arguments raised by Petitioner's counsel and affirmed Petitioner's conviction.[4] *Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000). Subsequently, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari*. *Fudge v. Arkansas*, 531 U.S. 1020 (2000).

**D. Rule 37.5 Proceedings.**

    **1. Grounds for Relief/Circuit Court's Denial of Relief.**

On March 19, 2001, counsel,[5] on behalf of Petitioner, filed a petition for post-conviction relief in circuit court pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure. Exhibit M (docket entry # 35) to Respondent's Response (docket entry #

---

[4]  While the Arkansas Supreme Court rejected counsel's argument that the trial court erred when it permitted the prosecution to adduce testimony from State's witnesses Deborah Wilson and Donald Brinkley about statements Kimberly Fudge had made to them on Christmas Eve about alleged violence committed against her by Petitioner, the Court did not address counsel's argument that the trial court's admission of the statements violated the Confrontation Clause of the Sixth Amendment .

[5]  Craig Lambert.

16), pp. 39-47. On January 2, 2002, counsel filed an amended petition (Exhibit M to

Respondent's Response, pp. 141-159), raising the following grounds for relief:

1.  Petitioner was represented, at trial and on direct appeal, by counsel who labored under a conflict of interest in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendment to the United States Constitution;

2.  Trial counsel were ineffective for failing to investigate and present evidence to support their motion to prohibit the use of voter registration records to select the jury panel;

3.  Trial counsel were ineffective for failing to move for a mistrial or seek other remedial measures based upon the State's continuous pattern of improper questioning of witnesses;

4.  Trial counsel were ineffective for failing to properly cross-examine Deborah Wilson and make use of Wilson's previous statement that "I intend to lie" in court;

5.  Trial counsel were ineffective for failing to "federalize" their motion for a directed verdict and their renewal of that motion;

6.  Trial counsel were ineffective for failing to call witnesses on Petitioner's behalf to substantiate his whereabouts during the days following December 25, 1997;

7.  Trial counsel were ineffective for failing to challenge Krystal Wade's voice identification;

8.  Trial counsel were ineffective in the penalty phase for, among other things, failing to object to the State's use of, and reference to, a purported prior conviction for first-degree battery;

9.  Appellate counsel was ineffective on direct appeal for failing to argue that Petitioner's statements to the police in Portland, Oregon, should have been suppressed under *Miranda* on the following grounds: (a) the *Miranda* warnings given to him were inadequate to put him on notice that he could exercise his right to remain silent at any point during the interrogation, (b) there was no clear waiver of his Fifth or Sixth Amendment rights, (c) police did not inform him that he could exercise his right to remain silent at any point during the interrogation, and (d) the *Miranda* rights form

that he signed "is constitutionally defective because it was inadequate to put [him] on notice that he had a Fifth and Sixth Amendment [right] to consult with an attorney, prior to the interrogation, at no cost to [him]"; and

10.    Petitioner is entitled to relief under the cumulative error doctrine.

On January 30, 2002, Petitioner filed a *pro se* motion in circuit court to preserve issues for relief under Rule 37.5. Exhibit M (docket entry # 35) to Respondent's Response (docket entry # 16), pp. 198-218.  In the motion, Petitioner raised numerous additional grounds for relief, including that (1) trial counsel were ineffective for failing to challenge drug-influenced State witnesses Lisa Channell and Lucille Taylor, (2) trial counsel were ineffective for refusing to investigate audio and video surveillance recordings from "Pilot Travel Center," (3) trial counsel were ineffective for failing to exercise peremptory challenges to strike jurors Storay, Giles, and Henry, (4) trial counsel were ineffective for failing to cross-examine several State witnesses, and (5) appellate counsel was ineffective on direct appeal for failing to argue that Portland, Oregon, police conducted an "illegal Mirandization" and compelled Petitioner to Mirandize himself.  A hearing was held on January 31, 2002, and February 1, 2002. Exhibit M to Respondent's Response, pp. 339-692.  At the hearing, the circuit judge allowed counsel for Petitioner to adopt the *pro se* motion to preserve issues for Rule 37.5 relief as a supplement to the amended Rule 37.5 petition filed by counsel on January 2, 2002. Exhibit M to Respondent's Response, pp. 344-346, 357-358.

On April 12, 2002, the circuit court entered an order denying Petitioner Rule 37.5 relief, finding that the claims raised by counsel were without merit. Exhibit M to Respondent's Response, pp. 330-336. The court did not address the claims raised in

Petitioner's *pro se* motion to preserve issues for Rule 37.5 relief.

## 2. First Appeal.

Petitioner appealed to the Arkansas Supreme Court from the circuit court's order denying Rule 37.5 relief. For reversal, counsel,[6] on behalf of Petitioner, raised the following points of error in his appellate brief (Exhibit G to Respondent's Response (docket entry # 16), pp. 306-338):

1.   The circuit court failed to render findings of facts and conclusions of law as required by Ark. R. Crim. P. 37.5(i);

2.   The circuit court erred in sustaining the State's objection to the introduction of Petitioner's Exhibit 13 because the exhibit was crucial to the court's determination of whether Petitioner's right to conflict-free appellate counsel was violated;

3.   Petitioner was denied his Sixth and Fourteenth Amendment right to representation by conflict-free counsel, both at trial and on direct appeal;

4.   Trial counsel were ineffective for failing to move for a mistrial or seek other remedial measures based upon the State's continuous pattern of improper questioning of witnesses;

5.   Trial counsel were ineffective for failing to properly cross-examine Deborah Wilson and make use of Wilson's previous statement that "I intend to lie" in court, both about an adulterous affair that she had and about her use of crack cocaine;

6.   Trial counsel were ineffective for failing to challenge Krystal Wade's voice identification;

7.   Trial counsel were ineffective during the penalty phase for, among other things, failing to object the State's use of, and reference to, the purported prior conviction for first-degree battery;

8.   Appellate counsel was ineffective on direct appeal for failing to

---

[6] Craig Lambert.

argue that Petitioner's statements to the police in Portland, Oregon, should have been suppressed under *Miranda* because (a) the *Miranda* warnings were inadequate to put Petitioner on notice that he could exercise his right to remain silent at any point during the interrogation, (b) there was no clear waiver of Petitioner's Fifth and Sixth Amendment rights, (c) police never informed Petitioner that he could exercise his right to remain silent at any point during the interrogation, and (d) the *Miranda* rights form that Petitioner signed "is constitutionally defective because it was inadequate to put [him] on notice that he had a Fifth and Sixth Amendment [right] to consult with an attorney, prior to the interrogation, at no cost to [him]"; and

9.     Petitioner is entitled to relief under the cumulative error doctrine.

The Arkansas Supreme Court reversed the circuit court's order denying Rule 37.5 relief, finding that the circuit court's order failed to comply with the requirements of Ark. R. Crim. P. 37.5(i), *i.e.*, that the circuit court "make specific written findings of fact with respect to each factual issue raised by the petition and specific written conclusions of law with respect to each legal issue raised by the petition." *Fudge v. State*, 354 Ark. 148, 151, 120 S.W.3d 600, 601-02 (2003).  The Arkansas Supreme Court found that the circuit court's order failed to sufficiently address three issues: (1) trial counsel were ineffective during the penalty phase of trial for failing to object to Petitioner's purported prior conviction for first-degree battery, (2) trial counsel were ineffective during the penalty phase of trial for failing to present evidence in mitigation and conduct an appropriate investigation for mitigating evidence, and (3) counsel on direct appeal had a conflict of interest. *Id.* at 151-53, 120 S.W.3d at 602-03. The Arkansas Supreme Court remanded the case to the circuit court to make specific findings of fact and conclusions of law on the three issues. *Id.* at 156, 120 S.W.3d at 605. The Court found that any claim raised below but not argued on appeal was

"considered abandoned." *Id.* at 151, 120 S.W.3d at 602.

### 3.  Proceedings on Remand.

In an order filed on December 3, 2003, the circuit court granted Petitioner a new sentencing hearing, concluding that trial counsel were ineffective during the penalty phase for failing to object to the introduction of evidence regarding a purported first-degree battery conviction when, in fact, Petitioner had only been convicted of robbery, a less violent offense. Petitioner's Petition (docket entry # 2), Document 2-3.  The circuit court found that the other arguments raised in the amended Rule 37.5 petition were without merit.

### 4.  Second Appeal.

The State appealed from the circuit court's order granting Petitioner a new sentencing hearing and argued that the circuit court erred by ruling that Petitioner's trial counsel were ineffective during the penalty phase for failing to object to the introduction of evidence regarding a purported first-degree battery conviction. Exhibit I to Respondent's Response (docket entry # 16). Petitioner cross-appealed and counsel,[7] on behalf of Petitioner, raised the following arguments in his appellate brief (Exhibit J to Respondent's Response (docket entry # 16)):

1.    Trial counsel were ineffective during the penalty phase for failing to investigate and present evidence of mitigation;

2.    Trial counsel were ineffective for failing to federalize the motion for directed verdict;

3.    Trial counsel were ineffective for failing to investigate and present evidence in support of the motion to prohibit the use of voter-

---

[7]  Dale Adams.

registration records to select the jury panel;

4.     Appellate counsel was ineffective on direct appeal for failing to argue that Petitioner's statements to Portland, Oregon, police should have been suppressed on the grounds that the *Miranda* rights form did not advise Petitioner that he had the right to stop the questioning at any time and there was no place on the form to indicate that he was waiving his rights; and

5.     Trial counsel were ineffective for failing to move for a mistrial or seek other remedial measures to rectify the State's continuous pattern of improper questioning of witnesses.

The Arkansas Supreme Court affirmed the circuit court's findings on both the State's appeal and Petitioner's cross-appeal. *State v. Fudge*, 361 Ark. 412, 206 S.W.3d 850 (2005). The Supreme Court found that the arguments raised by Petitioner's counsel on cross-appeal were without merit. *Id.* at 423-30, 206 S.W.3d at 858-63.

**5. Re-sentencing.**

On January 24, 2006, Petitioner was re-sentenced to life imprisonment without parole on his capital murder conviction.  Exhibit A to Respondent's Response.

## **FEDERAL HABEAS PETITION**

**I. Grounds for Relief/Response.**

On July 12, 2006, Petitioner filed the pending § 2254 petition in this Court, raising numerous grounds for relief. Docket entry # 2. On August 31, 2006, the Respondent filed a response to the petition, asserting that several of Petitioner's claims are procedurally barred.  Docket entry # 16.  On September 19, 2006, Petitioner filed a reply to Respondent's response, clarifying the claims that he is asserting and explaining why he did not present them in state court. Docket entry # 19. The Magistrate Judge finds that Petitioner has raised the following grounds for relief:

1.      The custodial statements that he gave to Portland, Oregon, police should have been suppressed because police:

> a. compelled him to Mirandize himself;
>
> b. engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004);
>
> c. denied his request for a lawyer before questioning began and continued to question him;
>
> d. continued to question him after he stated that he did not want to incriminate himself;
>
> e. misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights; and
>
> f. promised him leniency for his cooperation, rendering his statements involuntary;

2.      The trial court violated the Confrontation Clause of the Sixth Amendment by admitting into evidence prejudicial and biased hearsay statements by Kimberly Fudge under the excited utterance exception to the rule against hearsay;

3.      The trial court infected Petitioner's entire trial with constitutional error by:

> a. refusing to instruct the jury on the lesser-included offense of second-degree murder; and
>
> b. refusing to instruct the jury on the lesser-included offense of manslaughter;

4.      The evidence was insufficient to support his capital murder conviction;

5.      The Confrontation Clause of the Sixth Amendment and the Due Process Clause were violated when Dr. Steven Erickson testified at trial as to findings and statements in an autopsy report prepared by Dr. Dan Conzelman;

6.      Trial counsel were ineffective for:

a. threatening Petitioner's alibi witnesses and causing them not to testify on his behalf;

b. hiding information that Krystal Wade, who was twelve years of age, had given birth to a child;

c. concealing video and audio surveillance recordings obtained from the Jones Brothers Pilot Truck Center;

d. allowing biased jurors to be seated on the panel;

e. coercing state witness Deborah Wilson to commit perjury;

f. concealing a tape recording on which Deborah Wilson stated her intention to lie in court;

g. refusing to cross-examine "several state witnesses";

h. failing to lodge a timely objection to Dr. Erickson's hearsay testimony;

i. failing to challenge the admissibility of his custodial interrogation on the basis that it was the product of an "interrogation first" tactic,

j. failing to cross-examine Dr. Erickson about post-mortem changes to Kimberly Fudge's body and "alleged abuse of a corpse";

k. coercing and unduly influencing Robert Williams' testimony;

l. eliciting "vision" testimony from witnesses with "serious vision impairments" and "hearing" testimony from witnesses with hearing impairments;

m. failing to cross-examine expert serologist Lisa Channell concerning mind-altering effects of post-operative medication;

n. failing to challenge drug-influenced state witnesses Lisa Channell and Lucille Taylor; and

o. failing to introduce evidence concerning the dome

lighting and interior design of Kimberly Fudge's vehicle.

## II. Disposition.

### A. Procedural Bar: Claims 1(a), 1(b), 1(c), 1(d), 1(e), 3(b), 5, and 6.

#### 1. Procedural Bar Law.

In considering a petition for federal habeas corpus relief, a federal district court usually is precluded from considering any issue that a state court has already resolved on an independent and adequate state law procedural ground. *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004); *Reagan v. Norris*, 279 F.3d 651, 656 (8th Cir. 2001); *Oxford v. Delo*, 59 F.3d 741, 744 (8th Cir. 1995). A federal district court also is ordinarily precluded from considering any claim that a petitioner has failed to "fairly present" to the appropriate state appellate court. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Wemark v. Iowa*, 322 F.3d 1018, 1020-1021 (8th Cir. 2003). *See also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (a petitioner's failure to present his claims to the appropriate state appellate court results in a procedural default of the claims). "A claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark*, 322 F.3d at 1021 (quoting *Joubert v. Hopkins*, 75 F.3d 1232, 1240 (8th Cir. 1996)). A habeas petitioner, in order to preserve a claim for federal habeas review, must alert the appropriate state appellate court to "the federal nature" of his claim in his brief on appeal. *Baldwin v. Reese*, 541 U.S. at 29-32 ("ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the

presence of a federal claim in order to find material, such as a lower opinion in the case, that does so")*; Adams v. Robertson*, 520 U.S. 83, 89 n. 3 (1997) ("passing invocations of 'due process' [that] fail to cite the Federal Constitution or any cases relying on the Fourteenth Amendment . . .  [do] not meet our minimal requirement that it must be clear that a *federal* claim was presented"); *Jones v. Jerrison*, 20 F.3d 849, 854 (8th Cir. 1994) ("The federal legal theory or theories must plainly appear on the face of the petitioner's state court briefs"); *McDougald v. Lockhart*, 942 F.2d 508, 510 (8th  Cir. 1991) ("Explicit citation to the Constitution or to a federal case is necessary for fair presentation of a constitutional claim in state court"); *Thomas v. Wyrick*, 622 F.2d 411, 413 (8th Cir. 1980) (holding that petitioner failed to present his federal claim to the state courts because his state-court brief did not cite any provision of the Federal Constitution or any federal case); *Morris v. Norris*, 83 F.3d 268, 269 (8th Cir. 1996) ("habeas petitioners must have explicitly cited to the United States Constitution or federal case law in their direct appeal to preserve federal review"). *See also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court").

Where the state court dismisses a habeas petitioner's claims on independent and adequate state law grounds or the petitioner has failed to fairly present his claims to the appropriate state appellate court, the claims are procedurally defaulted, and a federal district court cannot consider them unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged constitutional violation or

actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 744, 750-51 (1991); *Prewitt v. Goeke*, 978 F.2d 1073, 1077 (8th Cir. 1992); *Wemark*, 322 F.3d at 1021-22. The existence of cause "must ordinarily turn on whether the prisoner can show some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  At a minimum, a petitioner must show that something "*external* to [him], something that cannot be fairly attributed to him," caused the procedural default. *Ivy v. Caspari*, 173 F.3d 1136, 1140 (8th Cir. 1999) (quoting *Coleman v. Thompson*, 501 U.S. at 753).  For example, a showing that the factual or legal basis for the claim was not reasonably available to counsel, that some interference by officials made compliance impracticable, or that counsel's performance was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), would constitute factors external to the defense and cause for a procedural default. *Coleman v. Thompson*, 501 U.S. at 753.  Where a prisoner has no constitutional right to an attorney, such as in state post-conviction proceedings, any attorney error that led to default cannot constitute cause to excuse the default in federal court. *Coleman v. Thompson*, 501 U.S. at 757; *Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997).

**2.  Analysis.**

> **a.  Procedural Default/Cause.**

**i.  Claims 1(a), 1(b), 1(c), 1(d), and 1(e).**

In Claims 1(a), 1(b), 1(c), 1(d), and 1(e), Petitioner contends that the custodial statements that he gave to Portland, Oregon, police should have been suppressed

because police: (a) compelled him to Mirandize himself, (b) engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, (c) denied his request for a lawyer before questioning began and continued to question him, (d) continued to question him after he stated that he did not want to incriminate himself, and (e) misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights.  In his response, the Respondent asserts that Claims 1(b), 1(c), and 1(e) are procedurally barred, but does not expressly address Claims 1(a) and 1(d). The Magistrate Judge raises *sua sponte* the issue of procedural bar with respect to Claims 1(a) and 1(d).  It is well established that a federal court may raise *sua sponte* the issue of procedural bar. *King v. Kemna*, 266 F.3d 816, 821-22 (8th Cir. 2001); *Hardiman v. Reynolds*, 971 F.2d 500, 503-05 (10th Cir. 1992). *Cf. Day v. McDonough*, 547 U.S. 198,126 S. Ct. 1675,1682-84 (2006) (noting that "the Courts of Appeals have unanimously held that, in appropriate circumstances, courts, on their own initiative, may raise a petitioner's procedural default" and holding that "district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition")

The appropriate state remedy for Claims 1(a), 1(b), 1(c), 1(d), and 1(e) was direct appeal, not Rule 37.5.  "Generally, Rule 37 does not provide a remedy when an issue could have been raised in the trial or argued on appeal." *Howard v. State*, 2006 Ark. LEXIS 417 at * 7 (Ark. Sup. Ct. June 29, 2006); *Camargo v. State*, 346 Ark. 118, 123, 55 S.W.3d 255, 259 (2001).  "Stated another way, it is not appropriate to raise trial errors, including constitutional errors, for the first time in a Rule 37 proceeding."

*Howard*, 2006 Ark. LEXIS 417 at * 7.  "However, there is an exception to this general rule for errors so fundamental as to render the judgment of conviction void and subject to collateral attack." *Id.*; *Kemp v. State*, 348 Ark. 750, 765, 74 S.W.3d 224, 232 (2002). "A ground sufficient to void a conviction must be one so basic that it renders the judgment a complete nullity, for example, a judgment obtained in a court lacking jurisdiction to try the accused, or a conviction obtained in violation of an accused's rights against double jeopardy." *Jeffers v. State*, 301 Ark. 590, 591, 786 S.W.2d 114 (1990); *Howard*, 2006 Ark. LEXIS 417 at * 7; *Rowbottom v. State*, 341 Ark. 33, 37,13 S.W.3d 904, 906 (2000).  The grounds raised in Claims 1(a), 1(b), 1(c), 1(d), and 1(e) are not so basic as to render Petitioner's judgment of conviction a complete nullity. *See Sullivan v. State*, 1997 Ark. LEXIS 467 at ** 3-4 (Ark. Sup. Ct. July 14, 1997) (a claim that the defendant was not properly advised of his *Miranda* rights is not a claim "sufficient to demonstrate that the judgment entered against him was a complete nullity"); *Watson v. State*, 282 Ark. 246, 247-48, 667 S.W.2d 953, 954 (1984) (a claim that the defendant was denied his right to counsel before he gave a statement to police is not a claim "so fundamental as to render the judgment void and open to collateral attack"). *Cf. Wright v. State*, 1999 Ark. LEXIS 600 at * 4  (Ark. Sup. Ct. Nov. 18, 1999) (a claim that a statement that the defendant gave to police was obtained in violation of his *Miranda* rights is not cognizable under Rule 37).

Petitioner's counsel did not raise Claims 1(a), 1(b), 1(c), 1(d), and 1(e) on direct appeal. In supplemental *pro se* briefs tendered to the Arkansas Supreme Court on direct appeal but not accepted and filed, Petitioner alleged that Portland, Oregon, police

failed to provide him "the requested attorney," which is similar to his allegation in Claim 1(c) of his habeas petition that police denied his request for a lawyer before questioning began and continued to question him.   However, Petitioner did not argue, as he does here in Claims 1(a), 1(b), 1(d), and 1(e), that police compelled him to Mirandize himself, engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, continued to question him after he stated that he did not want to incriminate himself, and misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights.   As previously noted, the Arkansas Supreme Court denied Petitioner's motion for permission to participate as co-counsel on direct appeal and to file a supplemental *pro se* brief. *Fudge v. State*, 341 Ark. 652, 19 S.W.3d 22 (2000). In so doing, the Arkansas Supreme Court relied on the United States Supreme Court's holding in *Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000), that a criminal defendant has no constitutional right to self-representation on direct appeal from his conviction. *Fudge*, 341 Ark. at 652-53, 19 S.W.3d at 23. The Arkansas Supreme Court found that while the United States Supreme Court in *Martinez* "left to the State appellate courts the discretion to allow a lay person to proceed *pro se* on appeal, it also recognized that representation by trained appellate counsel is of distinct benefit to the appellant as well as to the court." *Id.* at 653, 19 S.W.3d at 23. The Arkansas Supreme Court concluded that Petitioner, who was represented by counsel qualified to represent defendants in capital cases, had not demonstrated good cause to permit him to serve as co-counsel or file a supplemental *pro se* brief. *Id.*

In light of the United States Supreme Court's holding in *Martinez* that a criminal

defendant has no constitutional right to represent himself on direct appeal from his conviction, a criminal defendant does not have "a constitutional entitlement to submit a *pro se* appellate brief on direct appeal in addition to the brief submitted by appointed counsel." *See McMeans v. Brigano*, 228 F.3d 674, 684 (6th Cir. 2000).  In addition, because a criminal defendant has no right to hybrid representation (to act as co-counsel when he is represented by counsel), *see, e.g., United States v. Swinney*, 970 F.2d 494, 498 (8th Cir. 1992), a criminal defendant who is represented by counsel on direct appeal has no constitutional right to file a *pro se* brief. *See Myers v. Johnson*, 76 F.3d 1330, 1335 (5th Cir. 1996) (because there is no constitutional right to hybrid representation, a criminal appellant "waives his right to present *pro se* briefs on direct appeal" by accepting the assistance of counsel); *United States v. Ogbonna*, 184 F.3d 447, 449 (5th Cir. 1999) (relying on *Myers* and denying the defendant's motion to file a *pro se* brief on appeal from his federal convictions where his counsel had already filed a competent brief on his behalf); *United States v. Gwiazdzinski*, 141 F.3d 784, 787 (7th Cir. 1998) (declining to accept the defendant's *pro se* brief on appeal from his federal conviction because a defendant "does not have an affirmative right to submit a pro se brief when represented by counsel").

The Magistrate Judge finds that the Arkansas Supreme Court acted appropriately and in accordance with established law in denying Petitioner's motion for permission to participate as co-counsel on direct appeal and to file a supplemental *pro se* brief. The Magistrate Judge concludes that Petitioner did not fairly present Claims 1(a), 1(b), 1(c), 1(d), and 1(e) to the Arkansas Supreme Court. However, this

conclusion does not necessarily mean that the claims are procedurally defaulted in light

of the Eighth Circuit's decision in *Collins v. Lockhart*, 754 F.2d 258 (8th Cir. 1985). In

*Collins*, the criminal defendant's counsel raised a "pecuniary-gain argument" at trial, but

the argument was not raised in the defendant's brief on direct appeal, and the Arkansas

Supreme Court's opinion affirming the defendant's conviction did not mention the

argument expressly. In the defendant's appeal from the denial of federal habeas corpus

relief, the Eighth Circuit found that the pecuniary-gain argument was not procedurally

barred because the Arkansas Supreme Court followed its regular practice in capital

cases of reviewing, pursuant to Ark. Stat. Ann. § 43-2725 (Supp. 1973),[8] "all points

properly raised at trial, whether or not argued in the brief on [direct] appeal." *Collins*,

754 F.2d at 262. It is important to note that habeas jurisprudence after *Collins v.*

*Lockhart* casts doubt on the viability of its holding that an argument not raised nor

expressly addressed by the Arkansas Supreme Court on direct appeal is preserved for

habeas review if the defendant raised the argument at trial and the Arkansas Supreme

Court followed its regular practice in direct appeals in capital cases of reviewing all

points properly raised at trial, whether or not argued in the appellate brief. The United

States Supreme Court has made it clear that a habeas petitioner, in order to preserve

a claim for federal habeas review, must "fairly present" his federal claim to the

_____

[8]  Ark. Stat. Ann. § 43-2725, which is now codified in Ark. Code Ann. § 16-91-113(a) (Repl. 2006), provided:

> The Supreme Court need only review those matters briefed and
> argued by the appellant provided that where either a sentence for
> life imprisonment or death, the Supreme Court shall review all
> errors prejudicial to the rights of the appellant.

appropriate state appellate court in his appellate brief, "thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. at 32 ("ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower opinion in the case, that does so"). *See also Duncan v. Henry*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court"). The Supreme Court also has held that where the petitioner did not properly present his federal claim to the state's highest court and that court did not "expressly address" the claim, the claim is not preserved for review. *Adams v. Robertson,* 520 U.S. at 86.

In *Bell v. Cone*, 543 U.S. 447 (2005), the United States Supreme Court emphasized, albeit in *dicta,* that the burden is on the petitioner to present his federal claim to the appropriate state appellate court in order to preserve it for review, notwithstanding the fact that the state appellate court could have addressed the claim without its having been raised by the petitioner. In *Bell*, the Sixth Circuit concluded that the petitioner's argument, *i.e.*, that one of the aggravating circumstances was unconstitutionally vague under the Eighth Amendment, was not procedurally defaulted because the Tennessee Supreme Court's "statutorily mandated review of each death sentence [citation omitted] necessarily included the consideration of constitutional deficiencies in the aggravating circumstances found by the jury and therefore that the

issue was 'fairly presented' to the state court, even if [petitioner] did not raise it himself." *Id.* at 451. The State argued to the United States Supreme Court that "the Sixth Circuit's conclusion in this regard is in tension with the decisions of other Courts of Appeals, which have held that a petitioner must raise his constitutional claim in state court in order to preserve it, notwithstanding the existence of a mandatory-review statute."[9] *Id.* at 451 n. 3. While the Supreme Court in *Bell* found it unnecessary to "express a view on this point," the Court emphasized that "as a general matter, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised." *Id.* (citing *Baldwin v. Reese*, 541 U.S. at 30-32).

It is not necessary to determine whether the holding in *Collins, i.e.,* that an argument not raised nor expressly addressed by the Arkansas Supreme Court on direct appeal is preserved for habeas review if the defendant raised the argument at trial and the Arkansas Supreme Court followed its regular practice in direct appeals in capital cases of reviewing all points properly raised at trial, whether or not argued in the appellate brief, is still viable. Under *Collins*, Claims 1(a), 1(b), 1(c), (d), and 1(e) are not preserved for review since Petitioner did not present them to the trial court.

---

[9] Several federal Courts of Appeals have held that statutorily-mandated independent review on direct appeal by a state appellate court for errors or defects is not sufficient to preserve a claim for federal habeas view where the petitioner failed to present the claim to the state appellate court. *Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2984 (2006); *Kornahrens v. Evatt*, 66 F.3d 1350, 1362 (4th Cir. 1995); *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir. 1988).

In affirming Petitioner's capital murder conviction on direct appeal, the Arkansas Supreme Court, pursuant to Rule 4-3(h) of the Rules of the Arkansas Supreme Court,[10] reviewed the record for "adverse rulings objected to by appellant James Fudge but not argued on appeal," and found no reversible error. *Fudge*, 341 Ark. at 770, 20 S.W.3d at 321.  It is the Arkansas Supreme Court's established practice, where the sentence is death or life imprisonment, to review the record, pursuant to Rule 4-3(h), "for all errors raised in the trial court that are prejudicial to the appellant regardless of whether the errors are raised on appeal." *Greene v. State*, 335 Ark. 1, 10, 977 S.W.2d 192, 195 (1998).  The Arkansas Supreme Court has a "duty, pursuant to Ark. Sup. Ct. R. 4-3(h), to examine the record for error on objections decided adversely to the appellant, not

---

[10]   Rule 4-3(h) provides:

When the sentence is death or life imprisonment, the Court must review all errors prejudicial to the appellant in accordance with Ark. Code Ann. § 16-91-113(a). To make that review possible, the appellant must abstract, or include in the Addendum, as appropriate, all rulings adverse to him or her made by the circuit court on all objections, motions and requests made by either party, together with such parts of the record as are needed for an understanding of each adverse ruling. The Attorney General will make certain and certify that all of those objections have been abstracted, or included in the Addendum, and will brief all points argued by the appellant and any other points that appear to involve prejudicial error.

Ark. Code Ann. § 16-91-113(a) (Repl. 2006) provides:

The Supreme Court need only review those matters briefed and argued by the appellant, except that where either a sentence for life imprisonment or death has been imposed the Supreme Court shall review all errors prejudicial to the rights of the appellant.

to address arguments that might have been made." *Tillman v. State*, 364 Ark. 143, 147, 217 S.W.3d 773, 775-76 (2005) (holding that the appellant's argument that the evidence was insufficient to support his conviction because there was insufficient corroboration of accomplice testimony was barred because he did not specifically challenge the State's evidence corroborating the accomplice testimony in his directed-verdict motion); *Woolbright v. State*, 357 Ark. 63, 78 n. 2, 160 S.W.3d 315, 325 n. 2 (2004) (review under Rule 4-3(h) is limited to arguments and points of error raised by the appellant at trial); *Meadows v. Norris*, 2007 U.S. Dist. LEXIS 85428 at * 5 (E.D. Ark. Nov. 9, 2007) (finding that the Arkansas Supreme Court's review under Rule 4-3(h) is limited to issues actually raised in the trial court).

In Petitioner's cross-appeal from the partial denial of Rule 37.5 relief, the Arkansas Supreme Court adjudicated Petitioner's claim that counsel on direct appeal was ineffective for failing to argue that Petitioner's statement to Portland, Oregon, police should have been suppressed on the basis that the *Miranda* rights form used by the police was deficient.  In doing so, the Supreme Court found that in conducting its review on direct appeal under Rule 4-3(h), the Court reviewed all errors, including the denial of Petitioner's motion to suppress, and "implicitly found no reversible error." *Fudge*, 361 Ark. at 428, 206 S.W.3d at 862. The Supreme Court concluded that since there was no reversible error, counsel was not ineffective on direct appeal for failing to argue that Petitioner's statement to Portland, Oregon, police should have been suppressed on the basis that the *Miranda* rights form used by the police was deficient. *Id.* at 429, 206 S.W.3d at 863.

In a motion to suppress Petitioner's statements to Portland, Oregon, police, Petitioner's counsel argued, in pertinent part, that Petitioner's statements should be suppressed because the statements were obtained in violation of his Fifth and Sixth Amendment rights and *Miranda* in that he "was not adequately informed of his rights of self-incrimination, . . . his right to free legal counsel before making any statement, . . . [and] that he could stop the questioning at any time that he wished." Trial Transcript, pp. 151-152. In Petitioner's motion for new trial, counsel for Petitioner argued, in pertinent part, that (1) the *Miranda* rights form used by Portland, Oregon, police "does not inform any suspect that he may stop questioning at any time, nor is a suspect informed that he is entitled to have an attorney appointed at no cost," and (2) the process used by police violated *Miranda* because police never informed Petitioner that "he had a continuous opportunity to exercise his right to remain silent" and did not make any reference to his indigency in connection with informing him that an attorney would be appointed for him. Tr. 263-264.  In the motion to suppress statements and motion for new trial, counsel for Petitioner did not argue, as Petitioner does here in Claims 1(a), 1(b), 1(c), 1(d), and 1(e), that his statements should have been suppressed because police (a) compelled him to Mirandize himself, (b) engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, (c) denied his request for a lawyer before questioning began and continued to question him, (d) continued to question him after he stated that he did not want to incriminate himself, and (e) misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights.

The Magistrate Judge finds that the Arkansas Supreme Court's review under

Rule 4-3(h) is limited to issues actually raised in the trial court. Because Petitioner did not raise Claims 1(a), 1(b), 1(c), 1(d), and 1(e) in the trial court, these claims are procedurally defaulted. As cause for his failure to properly present these claims in state court, Petitioner asserts that both trial counsel and counsel on direct appeal were ineffective for refusing to raise the claims. A claim of ineffective assistance of counsel must be presented in state court as an independent claim before it may be used to establish cause for a procedural default in a federal habeas corpus proceeding. *Taylor v. Bowersox*, 329 F.3d 963, 971 (8th Cir. 2003); *Frasier v. Maschner*, 304 F.3d 815, 817 (8th Cir. 2002).  In the appeals from the denial of Rule 37.5 relief, counsel for Petitioner did not argue that counsel was ineffective at trial or on direct appeal for refusing to raise Claims 1(a), 1(b), 1(c), 1(d), and 1(e). Therefore, counsel's alleged ineffectiveness does not constitute cause for Petitioner's procedural default of these claims.

As cause for his procedural default of Claims 1(a), 1(b), 1(c), 1(d), and 1(e), Petitioner also asserts that he presented the claims in his supplemental *pro se* briefs on direct appeal, but the Arkansas Supreme Court refused to accept the briefs. First, while Petitioner raised a claim similar to Claim 1(c) in his supplemental *pro se* briefs, he did not raise Claims 1(a), 1(b), 1(d), and 1(e) in the briefs. Furthermore, as previously found, the Arkansas Supreme Court acted appropriately and in accordance with established law in denying Petitioner's motion for permission to participate as co-counsel on direct appeal and to file a supplemental *pro se* brief. Therefore, the Arkansas Supreme Court's refusal to accept Petitioner's supplemental *pro se* briefs

does not excuse his procedural default of Claims 1(a), 1(b), 1(c), 1(d), and 1(e). *See McMeans*, 228 F.3d at 684 (because a criminal defendant does not have "a constitutional entitlement to submit a *pro se* appellate brief on direct appeal in addition to the brief submitted by appointed counsel," the Ohio Court of Appeals' decision to strike the defendant's *pro se* brief does not constitute to excuse his procedural default).

**ii.  Claim 3(b).**

In Claim 3(b), Petitioner contends that the trial court infected his entire trial with constitutional error by refusing to instruct the jury on the lesser-included offense of manslaughter. The appropriate state-court remedy for this claim was direct appeal, not Rule 37.5. *See Kennedy v. State*, 338 Ark. 125, 129, 991 S.W.2d 606, 608-09 (1999) (stating that "even constitutional issues must be raised in the trial court and on direct appeal, rather than in Rule 37 proceedings, [unless the error is] so fundamental as to render the judgment of conviction void and subject to collateral attack" and holding that "the right to have the jury instructed on all lesser included offenses supported by the evidence is not a fundamental right that warrants review of the omission of such instructions for the first time in a Rule 37 proceeding").  Counsel for Petitioner on direct appeal did not argue to the Arkansas Supreme Court that the trial court infected Petitioner's entire trial with constitutional error by failing to instruct the jury on the lesser-included offense of manslaughter. In addition, Petitioner's trial counsel did not object to the trial court's failure to instruct the jury on the lesser-included offense of manslaughter, nor argue to the trial court that it infected Petitioner's entire trial with constitutional error by failing to so instruct the jury. Accordingly, the Arkansas Supreme,

in conducting its review on direct appeal pursuant to Rule 4-3(h), could not have considered Petitioner's claim that the trial court infected his entire trial with constitutional error by refusing to instruct the jury on the lesser-included offense of manslaughter.  As previously noted, the Arkansas Supreme Court's review under Rule 4-3(h) is limited to issues actually raised in the trial court.

In conclusion, the Magistrate Judge finds that Claim 3(b) is procedurally defaulted.  Petitioner has not alleged any facts showing cause for his procedural default of Claim 3(b).

### iii.  Claim 5.

In Claim 5, Petitioner argues that the Confrontation Clause of the Sixth Amendment and the Due Process Clause were violated when Dr. Steven Erickson testified at trial as to findings and statements in an autopsy report prepared by Dr. Dan Conzelman. The appropriate state remedy for this claim was direct appeal, not Rule 37.5. *See Holloway v. State*, 276 Ark. 120, 122, 632 S.W.2d 428, 429 (1982) (concluding that the defendant's claim that he was denied his right to confront witnesses was either raised or could have been raised on direct appeal and, therefore, that the claim was not cognizable under Rule 37). Counsel for Petitioner on direct appeal did not present the argument that the Confrontation Clause of the Sixth Amendment and the Due Process Clause were violated when Dr. Erickson testified at trial as to findings and statements in an autopsy report prepared by Dr. Conzelman. In addition, Petitioner's trial counsel did not object to Dr. Erickson's testimony as to findings and statements in an autopsy report prepared by Dr. Conzelman, much less argue to the trial court that the Confrontation Clause of the Sixth Amendment and the

Due Process Clause were violated when Dr. Erickson so testified. Accordingly, the Arkansas Supreme Court, in conducting its review on direct appeal pursuant to Rule 4-3(h), could not have considered Petitioner's claim that the Confrontation Clause and the Due Process Clause were violated when Dr. Steven Erickson testified at trial as to findings and statements in an autopsy report prepared by Dr. Dan Conzelman. The Magistrate Judge finds that Claim 5 is procedurally defaulted.

As cause for his failure to properly present Claim 5 on direct appeal, Petitioner asserts that the Arkansas Supreme Court refused to accept his supplemental *pro se* briefs on direct appeal in which he presented the claim.  The Magistrate Judge finds that the Arkansas Supreme Court's refusal to accept Petitioner's supplemental *pro se* briefs does not constitute cause for his procedural default of Claim 5 for two reasons. First, Petitioner did not raise Claim 5 in his supplemental *pro se* briefs. He simply argued that the trial court erred in admitting hearsay testimony by Dr. Steven Erickson about "the reported range of death" and about "information from a copy of a missing person's report by North Little Rock Police Department that was ruled inadmissible." Exhibit G to Respondent's Response (docket entry # 16), p. 000209; Petitioner's Petition (docket entry # 2), Document 2-3.  Second, the Arkansas Supreme Court acted appropriately and in accordance with established law in refusing to accept Petitioner's supplemental *pro se* briefs. Thus, the Court's refusal to accept the briefs does not constitute cause for his procedural default of Claim 5. *See McMeans*, 228 F.3d at 684.

Petitioner also asserts, as cause for his procedural default of Claim 5, that counsel on direct appeal was ineffective for refusing to raise the claim.  Counsel for Petitioner did not present counsel's ineffectiveness on direct appeal in refusing to

present Claim 5 as an independent claim in the appeals from the denial of Rule 37.5 relief. Accordingly, counsel's alleged ineffectiveness does not constitute cause for Petitioner's procedural default of Claim 5. *See Taylor v. Bowersox*, 329 F.3d at 971.

**iv.  Claim 6.**

In Claim 6, Petitioner contends that trial counsel were ineffective for: (a) threatening Petitioner's alibi witnesses and causing them not to testify on his behalf, (b) hiding information that Krystal Wade, who was twelve years of age, had given birth to a child, (c) concealing video and audio surveillance recordings obtained from the Jones Brothers Pilot Truck Center, (d)  allowing biased jurors to be seated on the panel, (e) coercing state witness Deborah Wilson to commit perjury, (f) concealing a tape recording on which Deborah Wilson stated her intention to lie in court, (g)  refusing to cross-examine "several state witnesses," (h) failing to lodge a timely objection to Dr. Erickson's hearsay testimony, (i) failing to challenge the admissibility of his custodial interrogation on the basis that it was the product of an "interrogation first" tactic, (j) failing to cross-examine Dr. Erickson about post-mortem changes to Kimberly Fudge's body and "alleged abuse of a corpse," (k) coercing and unduly influencing Robert Williams' testimony, (l) eliciting "vision" testimony from witnesses with "serious vision impairments" and "hearing" testimony from witnesses with hearing impairments, (m) failing to cross-examine expert serologist Lisa Channell concerning mind-altering effects of post-operative medication, (n) failing to challenge drug-influenced state witnesses Lisa Channell and Lucille Taylor, and (o) failing to introduce evidence concerning the dome lighting and interior design of Kimberly Fudge's vehicle. The appropriate state remedy for these claims was Rule 37.5, not direct appeal. A claim of

ineffective assistance of counsel is not cognizable on direct appeal unless the appellant "first presented that claim to the trial court during the trial or in a motion for new trial." *Smith v. State*, 328 Ark. 249, 250, 943 S.W.2d 234, 235 (1997); *Walker v. State*, 330 Ark. 652, 657, 955 S.W.2d 905, 908 (1997). Counsel for Petitioner did not present the ineffective assistance of counsel claims contained in Claim 6 during trial or in a motion for new trial.

The appropriate appellate forum for the ineffective assistance of counsel claims contained in Claim 6 was Petitioner's cross-appeal from the partial denial of Rule 37.5 relief.[11] Petitioner's counsel did not raise any of the claims in the cross-appeal. Accordingly, the claims are procedurally defaulted.

As cause for his failure to properly present the claims contained in Claim 6 in state court, Petitioner asserts that counsel on direct appeal was ineffective in refusing to raise the claims. Because the claims were not cognizable on direct appeal, counsel's alleged ineffectiveness in refusing to raise the claims on direct appeal does not

_____

[11] As previously noted, in Petitioner's first appeal from the denial of Rule 37.5 relief, the Arkansas Supreme Court reversed the circuit court's order denying Rule 37.5 relief because the circuit court did not make the written findings of fact and conclusions of law required by Rule 37.5(i) with respect to three issues and remanded the case to the circuit court to make such findings. *Fudge v. State*, 354 Ark. at 151-56, 120 S.W.3d at 601-05 (2003). The Supreme Court did not adjudicate any of the ineffective assistance of counsel claims raised in the appeal. On remand, the circuit court granted Petitioner a new sentencing hearing, concluding that trial counsel were ineffective during the penalty phase for failing to object to the introduction of evidence regarding a purported first-degree battery conviction when, in fact, Petitioner had only been convicted of robbery, a less violent offense. The circuit court found that the other arguments raised in Petitioner's amended Rule 37.5 petition were without merit. The State appealed, and Petitioner cross-appealed. The Arkansas Supreme Court affirmed the circuit court's findings on both the State's appeal and the Petitioner's cross-appeal. *State v. Fudge*, 361 Ark. 412, 206 S.W.3d 850 (2005).

constitute cause for Petitioner's procedural default of the claims. Furthermore, counsel's alleged ineffectiveness in refusing to raise the claims on direct appeal does not constitute cause for Petitioner's procedural default for another reason. Rule 37.5 counsel, in Petitioner's cross-appeal, did not argue that counsel was ineffective on direct appeal in refusing to raise the ineffective assistance of counsel claims contained in Claim 6. A claim of ineffective assistance of counsel must be presented in state court as an independent claim before it may be used to establish cause for a procedural default in a federal habeas corpus proceeding. *Taylor v. Bowersox*, 329 F.3d at 971.

Finally, while Petitioner does not argue, as cause for his procedural default of the ineffective assistance of counsel claims contained in Claim 6, that Rule 37.5 counsel was ineffective for failing to raise the claims, the Magistrate Judge notes that ineffective assistance of counsel in Rule 37.5 proceedings cannot constitute cause for a procedural default as a petitioner has no constitutional right to counsel in such proceedings. *See Simpson v. Norris*, 490 F.3d 1029, 1033-34 (8th Cir. 2007).

**b.  Actual Innocence.**

A narrow exception to the cause and prejudice standard exists where the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 496. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of . . . new evidence." *Schlup v. Delo*,  513 U.S. 298, 327 (1995); *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001); *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995).  "Evidence is only 'new'

if it was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'" *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) (quoting *Amrine*, 238 F.3d at 1029). To be credible, "a substantial claim that constitutional error has caused the conviction of an innocent person" must be supported with "new reliable evidence - - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial." *Schlup v. Delo*, 513 at 324; *House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064, 2077 (2006); *Weeks v. Bowersox*, 119 F.3d 1342, 1351 (8th Cir. 1997). However, in determining whether a petitioner has met the actual innocence exception, "the habeas court's analysis is not limited to [new reliable evidence]." *House v. Bell*, 126 S. Ct. at 2077.

Although Petitioner alleges that he is actually innocent, he has not pointed to nor submitted new reliable evidence showing his actual innocence. Accordingly, he has not met the actual innocence exception.

### c. Recommendation.

The Magistrate Judge recommends that Claims 1(a), 1(b), 1(c), 1(d), 1(e), 3(b), 5, and 6 be dismissed with prejudice as procedurally barred.

## B. Alternative Findings: The Merits of Claims 1(a), 1(b), 1(c), 1(d), and 1(e).

In Claims 1(a), 1(b), 1(c), 1(d), and 1(e), Petitioner contends that the custodial statements that he gave to Portland, Oregon, police should have been suppressed because police: (a) compelled him to Mirandize himself, (b) engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004), (c) denied

his request for a lawyer before questioning began and continued to question him, (d) continued to question him after he stated that he did not want to incriminate himself, and (e) misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights.

This Court's power to review state court decisions in habeas corpus cases is restricted to the "limited and deferential review" mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004); *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004). Under the AEDPA, a petition for writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As § 2254(d) makes clear, "there is a condition precedent that must be satisfied before [a federal court] can apply the deferential AEDPA standard to [a petitioner's] claim." *Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004). "The claim must have been 'adjudicated on the merits' in state court." *Id.* There is no "bright-line" rule to determine whether a claim has been adjudicated on the merits. *Id.* at 461. A federal court "must simply look at what a state court has said, case by case, and determine

whether the federal constitutional claim was considered and rejected by that court." *Id.*

The Eleventh Circuit has held that § 2254(d)(1) does not apply where there is "grave doubt" about whether the state appellate court, in adjudicating a claim, "applied federal law at all, let alone the governing law set down in Supreme Court decisions." *Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001). The Second Circuit has held that where the state appellate court "never indicated in any way that it had considered" the federal constitutional claims raised by petitioner, those claims were not adjudicated on the merits and the AEDPA's deferential standard of review did not apply. *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002).

Counsel for Petitioner did not raise Claim 1(a), 1(b), 1(c), 1(d), or 1(e) in Petitioner's motion to suppress his statements to police or motion for new trial, and the trial court did not adjudicate the claims.  In addition, counsel for Petitioner did not raise the claims on direct appeal. While the Arkansas Supreme Court, pursuant to Ark. Sup. Ct. R. 4-3(h), reviewed the record for adverse rulings objected to by Petitioner but not argued on direct appeal, the Court could not have adjudicated Claim 1(a), 1(b), 1(c), 1(d), or 1(e) because counsel for Petitioner did not raise any of the claims at trial.  As previously noted, the Arkansas Supreme Court's review pursuant to Rule 4-3(h) is limited to issues actually raised in the trial court. The Magistrate Judge finds that neither the trial court nor the Arkansas Supreme Court adjudicated Claim 1(a), 1(b), 1(c), 1(d), or 1(e) on the merits, and the provisions of 28 U.S.C. § 2254(d) mandating deference to state court adjudications on the merits do not apply.

Prior to the adoption of the AEDPA, federal district courts commonly held evidentiary hearings in habeas corpus cases so that a petitioner could develop the

factual basis for his claims. The AEDPA sharply limits a federal district court's power to conduct an evidentiary hearing. 28 U.S.C. § 2254(e)(2). Under 28 U.S.C. § 2254(e)(2), a federal district court cannot hold an evidentiary hearing unless one of the following two conditions is met: (1) the petitioner was not at fault in failing to the develop the factual basis of his claim in state court, or (2) the petitioner, if at fault, satisfies the criteria in 28 U.S.C. § 2254(e)(2). *See Holland v. Jackson*, 542 U.S. 649, 652-53 (2004); *Williams v. Taylor*, 529 U.S. 420, 430-37 (2004). In addition, a federal court may not rely on evidence that was not properly presented in a state-court proceeding unless one of the same two conditions is met. *Bradshaw v. Richey*, 546 U.S. 74, 79 (2005). If lack of diligence or some greater fault is attributable to the petitioner or his counsel, the first condition is not satisfied. *Williams v. Taylor*, 529 U.S. at 432.  To satisfy the criteria in 28 U.S.C. § 2254(e)(2) and thus meet the second condition, a petitioner must show that his claim relies on "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been discovered through the exercise of due diligence."  28 U.S.C. § 2254(e)(2).

At a hearing on Petitioner's motion to suppress his statements to Portland, Oregon, police, the State introduced evidence concerning the interrogation of Petitioner by police through the testimony of Sergeant David Rubey and Sergeant Kris Ferrell. At trial, Rubey testified on behalf of the State concerning the interrogation of Petitioner. The officers' testimony indicated, among other things, that Petitioner was Mirandized prior to questioning about his contact with Kimberly Fudge during the fall and Christmas holidays of 1997,  that he did not request a lawyer, and that the officers did not promise

him leniency for his cooperation. Counsel for Petitioner chose not to introduce any evidence at the suppression hearing, trial, or the hearing on his motion for new trial to controvert the testimony of Sergeant Rubey and Sergeant Ferrell. The Magistrate Judge finds that the failure to develop the factual basis of the claims contained in Claim 1 in state court was due to lack of diligence by Petitioner's counsel. The Magistrate Judge further finds that Petitioner has not satisfied the criteria in 28 U.S.C. § 2254(e)(2). Accordingly, this Court cannot hold an evidentiary hearing so that Petitioner can develop the factual basis of the claims contained in Claim 1, nor consider evidence that was not properly presented in state court proceedings.

Even if Petitioner were not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), he would not be entitled to such a hearing to develop the factual basis of the claims contained in Claim 1.  In deciding whether to grant an evidentiary hearing in a case where a petitioner is not barred from obtaining a hearing by 28 U.S.C. § 2254(e)(2), a federal court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schiro v. Landrigan*, ___ U.S. ___, 127 S. Ct. 1933, 1940 (2007). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

In Claims 1(a) and 1(d), Petitioner contends that his custodial statements to police should have been suppressed because police compelled him to Mirandize himself and continued to question him after he stated that he did not want to incriminate himself.  As will be discussed below, Petitioner's allegations, accepted as true, do not

-42-

entitle him to habeas relief. In Claims 1(b), 1(c), and 1(f), Petitioner contends that his custodial statements to police should have been suppressed because police engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*, denied his request for a lawyer before questioning began and continued to question him, and promised him leniency for his cooperation, rendering his statements involuntary. The evidence in the state court record refutes Petitioner's factual allegations with respect to these claims. In Claim 1(e), Petitioner contends that his statements to police should have been suppressed because police misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights. There is no evidence in the state court record tending to show that police misled Petitioner into believing that his that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights. It is highly unlikely that Petitioner could prove the factual basis of Claim 1(e).

The evidence presented at the hearing on Petitioner's motion to suppress his statements to police shows that he was taken into custody by Portland, Oregon, police on January 26, 1998, and transported to the Portland Police Bureau. Trial Transcript, pp. 386-388. Sergeant Rubey testified at the suppression hearing that Petitioner was taken to an interview room to be interviewed by Rubey and his partner, Sergeant Ferrell. Tr. 392. Initially, Rubey asked Petitioner if he could both read and write and how far he had gone in school. Tr. 393. Petitioner replied that he could read and write "adequately" and that he had gone through tenth grade. Tr. 393. Rubey then handed Petitioner a copy of the Bureau's standard constitutional rights advice form and asked Petitioner to read the form aloud. Tr. 393. Petitioner read aloud the entire rights form,

with the exception of the heading. Tr. 393, 399-400. The rights form advised Petitioner:

(1)     You have the right to remain silent.

(2)     Anything you say can be used against you in court.

(3)     You have the right to talk to attorney before we ask you any questions and have him present while you are being questioned.

(4)     If you cannot afford a lawyer, the court will appoint one before any questioning.

Tr. 417.

Rubey then asked Petitioner whether he understood his rights, and Petitioner stated that he understood his rights. Tr. 393. Petitioner signed and dated the rights form, indicating that he had "read each of the above rights and underst[ood] them." Tr. 393-394, 417. After Petitioner was Mirandized, he talked to the officers for a little over two hours. Tr. 395. Rubey testified that Petitioner never appeared confused about what his rights were. Tr. 394. Rubey testified that Petitioner never asked for an attorney, nor told Rubey that he did not want to talk to him. Tr. 397, 405, 411. Rubey stated that no threats were made to Petitioner and no attempts were made to coerce him or intimidate him into talking. Tr. 394-395. Rubey also testified he did not make any promises, express or implied, to Petitioner. Tr. 398. Rubey stated that neither he nor Sergeant Ferrell made any promises to Petitioner that if he cooperated with police, "something in particular would happen to his case or any investigation." Tr. 394. Rubey testified that he did not indicate to Petitioner that if he cooperated with police, the particular murder charge might be a lesser one. Tr. 399. Rubey testified that he did not mention any lesser offenses like manslaughter or second degree murder, but did tell Petitioner that the outcome "could run the gamut from no charges, actually, self-defense type

situation, all the way up to a capital murder situation." Tr. 399.

Rubey testified that about "a third of the way in the interview," Petitioner asked "where is this going?" and stated "I don't want to incriminate myself." Tr. 405-406. Rubey asked Petitioner what he meant. Tr. 405. Rubey informed Petitioner that his wife was dead and that the authorities in Little Rock had issued an arrest warrant charging him with her murder. Tr. 406. Petitioner began shaking his head side to side and repeatedly stating, "no." Tr. 406. Rubey explained to Petitioner that if he did not wish to speak with them further, they would stop the interview. Tr. 405-406. Petitioner then started to speak about his relationship with Kimberly Fudge. Tr. 406. Rubey stopped Petitioner and made him clarify whether the interview should go forward or not. Tr. 406, 411. Petitioner indicated that he wanted to continue talking to Rubey and Ferrell. Tr. 406, 411. Rubey then resumed questioning Petitioner. Tr. 406.

Sergeant Ferrell testified at the suppression hearing that Petitioner talked to him and Rubey after being advised of his rights and signing the rights form. Tr. 420. Ferrell stated that neither he nor Sergeant Rubey promised Petitioner that "if he cooperated a particular outcome would happen to him or something would happen to him if he did or did not cooperate." Tr. 419. Ferrell also testified that neither he nor Rubey suggested that if Petitioner would make a statement, the charge could be reduced to a lesser charge. Tr. 422. Ferrell stated that Sergeant Rubey explained to Petitioner that there could be a lesser charge depending on the circumstances of the crime. Tr. 422. Ferrell stated that neither he nor Sergeant Rubey threatened Petitioner. Tr. 419. Ferrell testified that at no point did Petitioner ask for an attorney or state he did not want to talk to Ferrell and Rubey. Tr. 420-421. Ferrell testified that Petitioner never asked that

questioning be stopped. Tr. 425. Ferrell stated that at one point in the interview, Petitioner stated that he did not want to incriminate himself. Tr. 425. Ferrell testified when Petitioner began to talk about his relationship with Kimberly Fudge, Sergeant Rubey stopped him and made him clarify if by mentioning self-incrimination, he meant that he wanted the interview to stop and did not want to talk to the officers anymore. Tr. 425. Ferrell testified that Petitioner stated that the officers could continue with the interview. Tr. 425.

At trial Sergeant Rubey testified that Petitioner gave the following information regarding his contact with Kimberly Fudge during the fall and Christmas holidays of 1997:  Petitioner called Kimberly Fudge on Christmas Eve, 1997, and asked her if he could come over. Tr. 1684-1685. She replied that he could come over. Tr. 1685. Petitioner was under a judge's order not to stay with Kimberly Fudge in her residence. Tr. 1684. Petitioner arrived at Kimberly's apartment at about 6:00 p.m. Tr. 1685. They talked, had dinner, and had consensual sexual relations. Tr. 1685-1686. Petitioner consumed a large quantity of alcohol that evening. Tr. 1685. After Petitioner and Kimberly had sexual relations, Kimberly left the apartment with a female co-worker to go to a party. Tr. 1685. Petitioner subsequently left the apartment with a friend, Sammy Junior. Tr. 1685-1686. Petitioner returned to the apartment at 11:00 p.m. and found the front door standing open. Tr. 1686-1687. Kimberly Fudge was not in the apartment, and Petitioner assumed that she was visiting someone else in the apartment complex. Tr. 1687. Petitioner went to bed. Tr. 1687. Kimberly Fudge returned to the apartment, and she and Petitioner fell asleep. Tr. 1687. Petitioner and Kimberly Fudge did not argue. Tr. 1687. The next day, Christmas Day, 1997, Petitioner was awakened by

police officers, who asked him to leave the apartment. Tr. 1687. The officers had received a call from Kimberly Fudge requesting that Petitioner be "put out of" the apartment. Tr. 1687. He left willingly, offering no resistance to the officers. Tr. 1688. The last time that Petitioner had contact with Kimberly Fudge was Christmas Day, 1997. Tr. 1688. Petitioner had no physical altercations with Kimberly Fudge during the fall or Christmas holidays of 1997, but did have "verbal altercations" with her during that time. Tr. 1691-1692. During the fall of 1997 through the Christmas holidays of 1997, the only occasion that Petitioner drove Kimberly's black Chevrolet Celebrity was a couple of nights prior to Christmas Eve, 1997. Tr. 1691-1692. Petitioner left Arkansas sometime after Christmas, 1997, and arrived in Portland, Oregon, before January 1, 1998. Tr. 1700.

Sergeant Rubey testified that during the point in the interview where the officers confronted Petitioner with witnesses' statements and allegations made against him, Rubey noticed a marked change in Petitioner's demeanor, *i.e.*, he refused to make eye contact and looked down at the floor. Tr. 1696-1698.

In Claim 1(a), Petitioner contends that his custodial statements to police should have been suppressed because police compelled him to Mirandize himself.

In *Miranda v. Arizona*, the United States Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201-02 (1989). *Miranda* requires that a suspect be told prior to any questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the

presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. at 479. There is no requirement that *Miranda* warnings "be given in the exact form described in that decision." *Duckworth v. Eagan*,  492 U.S. at 202; *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant, [and] *Miranda* itself indicated that no talismatic incantation was required to satisfy its strictures"). In addition, "[t]here is no requirement as to the precise manner in which police communicate the required [Miranda] warnings to one suspected of [a] crime." *Bell v. United States*, 382 F.2d 985, 987 (9th Cir. 1967).  In determining whether the *Miranda* warnings given were sufficient, a reviewing court's "inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. at 203 (quoting *California v. Prysock*, 453 U.S. at 361); *Missouri v. Seibert,* 542 U.S. at 611. Several federal Courts of Appeals have addressed whether advising a suspect of his rights only in writing is adequate and have uniformly held that it is sufficient if police advise the suspect of his *Miranda* rights by having him read a form setting forth his rights. *United States v. Sledge*, 546 F.2d 1120, 1121-22 (4th Cir. 1977); *United States v. Alexander*, 441 F.2d 403, 404 (3d Cir. 1971); *United States v. Coleman*, 524 F.2d 593, 594 (10th Cir. 1975);  *United States v. Van Dusen*, 431 F.2d 1278, 1280-81 (1st Cir. 1970); *United States v. Osterburg*, 423 F.2d 704, 705 (9th Cir. 1970).

        Before questioning Petitioner  about his contact with Kimberly Fudge during the

fall and Christmas holidays of 1997, Sergeant Rubey had Petitioner read the *Miranda* rights form aloud to Rubey and Sergeant Ferrell. As required by *Miranda*, the rights form advised Petitioner that he had the right to remain silent, that anything that he said could be used against him in court, that he had the right to talk to attorney before being questioned and the right to have the attorney present during questioning, and that if he could not afford a lawyer, the court would appoint one before any questioning. Rubey asked Petitioner whether he understood his rights, and Petitioner stated that he understood his rights. Petitioner then signed and dated the rights form, indicating that he had read his rights and understood them. The Magistrate Judge finds that the procedure used by police reasonably conveyed to Petitioner his rights as required by *Miranda*.

In Claim 1(b), Petitioner contends that his custodial statements to police should have been suppressed because police engaged in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*.

In *Missouri v. Seibert*, the United States Supreme Court held that because a "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, . . . a statement repeated after a warning under such circumstances is inadmissible." *Missouri v. Seibert,* 542 U.S. at 604, 611-17.

The testimony by Sergeant Rubey and Sergeant Ferrell at the suppression hearing shows that Petitioner was not interrogated about his contact with Kimberly Fudge during the fall and Christmas holidays of 1997 until after he was Mirandized. In

addition, he did not make a statement about his contact with her until after he was Mirandized. The Magistrate Judge finds that police did not engage in a "question first-Mirandize later" tactic in violation of *Missouri v. Seibert*. Accordingly, Claim 1(b) is without merit.

In Claim 1(c), Petitioner contends that his custodial statements to police should have been suppressed because police denied his request for a lawyer before questioning began and continued to question him.  In Claim 1(e), Petitioner contends that his custodial statements should have been suppressed because police misled him into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights. The testimony by Sergeant Rubey and Sergeant Ferrell at the suppression hearing indicates Petitioner did not request a lawyer before questioning or at any other point in the interview. There is no evidence in the state court record even tending to show that the officers misled Petitioner into believing that his signature on the rights form was an invocation rather than a waiver of his *Miranda* rights.  Accordingly, Claims 1(c) and 1(e) are without merit.

In Claim 1(d), Petitioner contends that his custodial statements to police should have been suppressed because police continued to question him after he stated that he did not want to incriminate himself.

"Once a person in custody has invoked his right to remain silent, law enforcement officers must scrupulously honor his assertion of that right." *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995). To invoke the right to remain silent and effectively cut off questioning, a suspect must unequivocally and unambiguously express his desire to

remain silent. *Simmons*, 235 F.3d at 1131 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)); *Johnson*, 56 F.3d at 955; *United States v. Mikell*, 102 F.3d 470, 476 (11th Cir. 1996).  If a suspect's statement is ambiguous or equivocal, the police may proceed with the interrogation. *See Simmons*, 235 F.3d at 1131; *Johnson*, 56 F.3d at 955; *Mikell*, 102 F.3d at 476. *Cf. Davis v. United States*, 512 U.S. at 459 ("if a suspect makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning"). "To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are considered as a whole." *Simmons*, 235 F.3d at 1131.

The Magistrate Judge finds that Petitioner's statement that he did not want to incriminate himself falls short of an unambiguous and unequivocal expression of his desire to remain silent. Therefore, officers did not have to cease questioning Petitioner. The Magistrate Judge further finds that Sergeant Rubey acted prudently after Petitioner stated that he did not want to incriminate himself by attempting to clarify whether Petitioner wanted the questioning to stop. *See Johnson*, 56 F.3d at 955 ("Agent Vera acted prudently by attempting to clarify whether Johnson was asserting his right to silence"). *Cf. Davis v. United States*, 512 U.S. at 461 ("when a suspect makes an ambiguous or equivocal statement, it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney"). In conclusion, the Magistrate Judge finds that Petitioner's claim that his custodial

statements should have been suppressed because police continued to question him after he stated that he did not want to incriminate himself is without merit.

**C.  Merits: Claims 1(f), 2, 3(a), and 4.**

> **1. Claim 1(f): Suppression of Petitioner's Statements to Police on the Basis of Promises  of Leniency.**

In Claim 1(f), Petitioner contends that the custodial statements that he gave to Portland, Oregon, police should have been suppressed because police promised him leniency for his cooperation, rendering his statements involuntary.  This claim is without merit.

Although counsel for Petitioner argued in the motion to suppress statements that Petitioner's statements to police were "involuntary, not freely given, nor knowingly and intelligently given," he did not argue that the statements were involuntary because police promised him leniency for his cooperation. Trial Transcript, pp. 151-152. The trial court denied the motion in summary fashion, stating: "That motion will be denied." Tr. 431. In Petitioner's motion for new trial, counsel for Petitioner argued, as Petitioner does in Claim 1(f), that Petitioner's statements to police were involuntary because they were obtained by a promise of leniency. Tr. 264. In the motion, counsel also raised other grounds for relief. After a hearing, the court denied the motion for new trial in summary fashion, stating: "[T]he Court . . .  hereby denies the defendant's motion for new trial." Tr. 268. In denying the motion, the trial court did not expressly indicate whether it considered the claim that Petitioner's statements to police were involuntary because they were obtained by a promise of leniency. Petitioner's counsel did not present the claim in Petitioner's brief on direct appeal to the Arkansas Supreme Court.

In conducting its review on direct appeal pursuant to Ark. Sup. Ct. R. 4-3(h), the Arkansas Supreme Court may have implicitly rejected the claim on the merits. However, because the Arkansas Supreme Court did not mention expressly any claim in conducting such review, the Magistrate Judge cannot say with any certainty that the Court adjudicated Petitioner's claim his statements to police were involuntary because they were obtained by a promise of leniency.  Under the circumstances, the Magistrate Judge, in addressing Claim 1(f), will not apply the provisions of § 2254(d) mandating deference to state court adjudications on the merits.

"To merit habeas corpus relief, [a petitioner] must prove he involuntarily made his statement to law enforcement officials." *Simmons*, 235 F.3d at 1132. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Id.* While "[i]t is improper for police to obtain a confession through an express or implied promise of leniency, . . . such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination." *Smith v. Bowersox*, 311 F.3d 915, 922  (8th Cir. 2002). "Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates an accused's due process rights.*" Battle v. Delo*, 19 F.3d 1547, 1564 (8th Cir. 1994) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). In determining whether a defendant's statement was voluntary, a court must consider the totality of the circumstances. *Withrow v. Williams*, 507 U.S. 680, 693 (1993); *Smith*, 311 F.3d at 922. "These circumstances may include, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the

defendant's maturity, education, physical condition, and mental condition." *Smith*, 311 F.3d at 922; *Simmons*, 235 F.3d at 1132-33.

Petitioner was thirty-three years old and had a tenth-grade education at the time police interrogated him at the Portland Police Bureau. The interrogation lasted a little over two hours. There is no evidence in the state court record that Petitioner was suffering from a mental disease at the time of the interrogation that would have make it easier for police to overbear his will or impair his capacity for self-determination. Psychological testing revealed no direct evidence of any mental retardation. Trial Transcript, p. 278. The testimony by Sergeant Rubey and Sergeant Ferrell at the suppression hearing indicates that the officers did not promise Petitioner leniency in exchange for his cooperation, and there certainly is no evidence in the state court record showing that the officers made a promise of leniency sufficient to overcome the Petitioner's free will and impair his capacity for self determination. The Magistrate Judge finds that Petitioner's statements to police were voluntary. In so finding, it is significant that police advised Petitioner of his *Miranda* rights prior to his making a statement, that Petitioner stated that he understood his rights, and that he signed a rights form indicating that he understood his rights. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984)).

**2. Claim 2: Confrontation Clause Violation in Admitting the Statements by Kimberly Fudge.**

In Claim 2, Petitioner contends that the trial court violated the Confrontation Clause of the Sixth Amendment by admitting into evidence prejudicial and biased hearsay statements by Kimberly Fudge under the excited utterance exception to the rule against hearsay.

At Petitioner's trial, Deborah Wilson testified that on the evening of December 24, 1997, or the early morning hours of December 25, 1997, Kimberly Fudge came running to Deborah's apartment. Trial Transcript, pp. 1298, 1324-1325. Kimberly lived in the apartment beneath Deborah's apartment. Tr. 1291.  Kimberly acted nervous and scared, and Deborah asked Kimberly what was wrong. Tr. 1298.  Kimberly stated, "We've got to go. We've got to go." Tr. 1298-1299. Kimberly and Deborah left in a car, picked up a friend, Donald Brinkley, and went to the house of another friend. Tr. 1299. While at the house, Deborah Wilson noticed that Kimberly had a cut on her lip and bruises on her neck. Tr. 1300-1301. The cut had blood running out of it.  Tr. 1301. Deborah asked Kimberly, "What happened to your lip?" Tr. 1300-1301. Kimberly replied that Petitioner had cut her lip, choked her, and forced her to have sex.  Tr. 1301-1302. Deborah Wilson testified that Kimberly was acting scared and nervous at the time. Tr. 1300-1302.

Donald Brinkley testified that on the night of December 24, 1997, or the early morning hours of December 25, 1997, Kimberly Fudge came to his residence. Tr. 1572, 1575. Brinkley testified that Kimberly was frightened and stated that she and her husband "were in some kind of confrontation." Tr. 1575.

In a pre-trial motion to prohibit hearsay, Petitioner's counsel stated that the State "apparently seeks to introduce hearsay statements of Kimberly Fudge" and that such

alleged statements were hearsay and inadmissible under Rules 802 and 403 of the Arkansas Rules of Evidence. Tr. 153. Counsel also argued that to allow the statements into evidence would violate Petitioner's Sixth Amendment right to confront witnesses. Tr. 153. In a preliminary hearing on the motion to prohibit hearsay, counsel for Petitioner argued that Kimberly Fudge's statements to Deborah Wilson were inadmissible as hearsay. Tr. 1223. Counsel also argued that admission of the statements would violate Petitioner's Sixth Amendment right to confront Kimberly Fudge. Tr. 1223, 1226. In response, the prosecution asserted that the statements were admissible under the excited utterance exception to the hearsay rule contained in Ark. R. Evid. 803(2). Tr. 1224, 1241. After Deborah Wilson testified about Kimberly Fudge's statements to her on the evening of December 24, 1997, or the early morning hours of December 25, 1997, the trial court ruled that Kimberly's statements were admissible, relying on *Moore v. State*, 317 Ark. 630, 882 S.W.2d 667 (1994). Tr. 1242. In *Moore*, the Arkansas Supreme Court set forth Arkansas law on the excited utterance exception and held that certain statements were admissible under the exception. The Supreme Court in *Moore* did not consider a Confrontation Clause argument.

In the case at bar, there is no indication from the trial court's ruling that it considered Petitioner's Confrontation Clause argument. On direct appeal, counsel for Petitioner argued that the trial court erred when it permitted the prosecution to adduce testimony from State's witnesses Deborah Wilson and Donald Brinkley about statements Kimberly Fudge had made to them on Christmas Eve about violence committed against Petitioner. Counsel also argued that the trial court's admission of the statements violated the Confrontation Clause of the Sixth Amendment. In its opinion

affirming Petitioner's conviction, the Arkansas Supreme Court did not mention Petitioner's Clause argument or indicate in any way that it was considering the argument.  Its analysis appears to be limited to the issue of whether the trial court erred in admitting the statements, which is typically a state law issue. Under the circumstances, the Magistrate Judge, in addressing Petitioner's claim that the trial court violated the Confrontation Clause by admitting into evidence hearsay statements by Kimberly Fudge under the excited utterance exception to the rule against hearsay,  will not apply the provisions of § 2254(d) mandating deference to state court adjudications on the merits.

The Confrontation Clause of Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause bars the admission of "testimonial statements of witnesses absent from trial" unless the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. at 59.  The decision in *Crawford* does not apply retroactively to cases already final on direct review. *Whorton v. Bockting*, ____ U.S. ____,127 S. Ct. 1173, 1177-84 (2007). Petitioner's capital murder conviction became final on direct review in 2000, well before *Crawford* was decided.  Accordingly, *Crawford* does not apply, and this Court must apply the law as it stood before *Crawford. Bockting v. Bayer*, 505 F.3d 973, 978 (9th Cir. 2007).

Prior to *Crawford*, the Confrontation Clause was satisfied where the proffered

hearsay had sufficient "guarantees of reliability to come within a firmly rooted exception to the hearsay rule." *White v. Illinois*, 502 U.S. 346, 356 n. 8 (1992); *Ohio v. Roberts*, 448 U.S. 56, 66 (1980); *Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999); *United States v. Brun*, 416 F.3d 703, 707 (8th Cir. 2005). Excited utterances are one such category of excepted statements. Ark. R. Evid. 803(2); *Thalacker*, 198 F.3d at 1061. An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ark. R. Evid. 803(2). In determining whether a declarant was under the stress of excitement caused by a startling event when he or she made a statement, a court may consider "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement." *Thalacker*, 198 F.3d at 1061; *United States v. Iron Shell*, 633 F.2d 77, 85-86 (8th Cir. 1980). "[T]he lapse of time between the startling event and the statement is not always dispositive in determining whether testimony should be admitted under the excited utterance exception." *Thalacker*, 198 F.3d at 1061*; Iron Shell*, 633 F.2d at 85. Courts have applied the excited utterance exception to statements made several hours after the startling event. *United States v. Baggett*, 251 F.3d 1087, 1090 & n. 1 (6th Cir. 2001) (applying the excited utterance exception to statements by a battered woman made several hours after the last of several spousal beatings over a three-day period); *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (applying the excited utterance exception to statements made by a battered

woman at 8:00 a.m. when the spousal beating ended at 4:00 a.m.). The fact that statements were made in response to questions, although relevant, does not destroy the statements' spontaneity. *Webb v. Lane*, 922 F.2d 390, 394 (7th Cir. 1991).

The Arkansas Supreme Court, on direct appeal, concluded that the trial court did not err in permitting the prosecution to adduce testimony from Deborah Wilson and Donald Brinkley about statements Kimberly Fudge had made to them on Christmas Eve about violence committed against her by Petitioner. *Fudge v. State*, 341 Ark. at 768-69, 20 S.W.3d at 320-21. The Supreme Court held that Kimberly Fudge's statements were admissible under the excited utterance exception to the rule against hearsay. *Id.* The Supreme Court found that "there was some lapse of time (anywhere from one to several hours) between the events in Kimberly's apartment and her relating those events to Deborah Wilson and Donald Brinkley." *Id.* at 769, 20 S.W.3d at 320. Relying on Deborah Wilson's testimony that Kimberly appeared nervous and scared from the time she ran upstairs to Deborah's apartment until the moment that she told Deborah and Donald Brinkley what had happened to her, the Supreme Court implicitly found that Kimberly was under the stress of excitement caused by the events in her apartment when she made her statements to Deborah Wilson and Donald Brinkley. *Id.* at 768-69, 20 S.W.3d at 320-21.

In a habeas proceeding instituted pursuant to 28 U.S.C. § 2254, "a determination of a factual issue made by a State court shall be presumed to be correct, [and] the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Rice v. Collins*, 546 U.S. 333, 338-

39 (2006). Both explicit factual findings and implicit factual findings are presumed correct under § 2254(e)(1). *Soffar v. Cockrell*, 300 F.3d 588, 594 (5th Cir. 2002); *Campbell v. Vaughn,* 209 F.3d 280, 285-86 (3d Cir. 2000). The Arkansas Supreme Court's explicit factual finding that there was a lapse of time between one to several hours between the events in Kimberly Fudge's apartment and her relating those events to Deborah Wilson and Donald Brinkley, as well as the Court's implicit factual finding that Kimberly Fudge was under the stress of excitement caused by the events at her apartment when she made her statements to Deborah Wilson and Donald Brinkley, are entitled to a presumption of correctness. Petitioner has not pointed to any evidence in the state court record, much less clear and convincing evidence, rebutting the presumption of correctness attached to the Arkansas Supreme Court's factual findings.[12] The Magistrate Judge further finds that the Arkansas Supreme Court's determination that Kimberly Fudge's statements were admissible under the excited utterance exception to the rule against hearsay found in Ark. R. Evid. 803(2), which is a determination on a matter of state law, is binding on this Court. *Bounds v. Delo*, 151 F.3d 1116, 1118 (8th Cir. 1998) (determinations of state law made by a state appellate court are binding on a federal court in a habeas proceeding); *Schleeper v. Groose*, 36 F.3d 735, 737 (8th Cir. 1994) ("A federal court may not re-examine a state court's

---

[12] The Magistrate Judge finds that the failure to develop, in state court, such evidence or other evidence to support Petitioner's claim that the trial court violated the Confrontation Clause by admitting Kimberly Fudge's statements into evidence, to the extent that such evidence exists, was due to the lack of diligence of Petitioner's counsel. The Magistrate Judge further finds that Petitioner has not satisfied the criteria in 28 U.S.C. § 2254(e)(2) with respect to his Confrontation Clause claim. Accordingly, this Court cannot hold an evidentiary hearing so that Petitioner can develop evidence to support his claim. *Holland v. Jackson*, 542 U.S. at 652-53.

interpretation and application of state law"). *Cf. Ricketts v. Dretke*, 2004 U.S. Dist. LEXIS 24986 at ** 5-6 (N.D. Tex. Aug. 12, 2004) (deferring to the state courts' determination that the testimony in question was, as a matter of state law, admissible under the excited utterance exception to the rule against hearsay and holding, therefore, that the petitioner's claim that admission of an out-of-court statement violated his rights under the Sixth Amendment's Confrontation Clause "must fail").

Because Kimberly Fudge's statements were admissible under the excited utterance exception, the trial court did not violate the Confrontation Clause by admitting the statements into evidence. *United States v. Brun*, 416 F.3d at 707; *Webb v. Lane*, 922 F.2d 390, 393-95 (7th Cir. 1991).

The Magistrate Judge further finds that any error by the trial court in admitting Kimberly Fudge's statements was harmless. On collateral review of a state-court criminal judgment under 28 U.S.C. § 2254, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, _____ U.S. _____,127 S. Ct. 2321, 2325, 2328 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). This standard applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman.*"[13] *Fry v. Pliler*, 127 S. Ct. at 2328. In light of the other convincing evidence of Petitioner's guilt, the admission of Kimberly Fudge's statements did not have a substantial and injurious effect or influence in determining the jury's verdict.

---

[13] *Chapman v. California*, 386 U.S. 18 (1967).

In conclusion, the Magistrate Judge recommends that Petitioner's claim that the trial court violated the Confrontation Clause of the Sixth Amendment by admitting into evidence the prejudicial and biased hearsay statements by Kimberly Fudge under the excited utterance exception to the rule against hearsay be dismissed with prejudice.

### 3.  Claim 3(a): Constitutional Error in Refusing to Instruct the Jury on the Lesser-Included Offense of Second-Degree Murder.

In Claim 3(a), Petitioner contends that the trial court infected his entire trial with "constitutional error" by refusing to instruct the jury on the lesser-included offense of second-degree murder.

At Petitioner's trial, his counsel offered an instruction on second-degree murder, but the trial court declined to give the instruction. Tr. 1752. Petitioner's counsel did not argue to the trial court that the court's refusal to give the instruction violated the Constitution. On direct appeal, Petitioner's counsel argued that trial court erred in refusing to instruct the jury on the lesser-included offense of second-degree murder. Exhibit C to Respondent's Response (docket entry # 16), pp. 374-380.  In support of the argument, counsel cited *Beck v. Alabama*, 447 U.S. 625 (1980), for the proposition that "a state may not, consistent with the eighth and fourteenth amendments, deprive a defendant of the opportunity to have the jury determine not only his or her guilt or innocence but also the degree of his or her guilt, where there is any rational basis upon which to find guilt on a lesser offense." Exhibit C to Respondent's Response, p. 380. Although Petitioner cited *Beck* in support of his argument, it is unclear from the Arkansas Supreme Court's decision whether the Court actually considered the federal nature of Petitioner's claim. Under the circumstances, the Magistrate Judge will not give

the Arkansas Supreme Court's decision deference under 28 U.S.C. § 2254(d).

In *Beck v. Alabama*, the defendant was convicted of the capital offense of robbery-intentional killing and sentenced to death.  Under the Alabama death penalty statute, the trial court was prohibited from giving the jury the option of convicting the defendant of a lesser-included offense. Under the defendant's version of events, he would have been entitled to an instruction on the lesser-included offense of felony murder, but for the statutory prohibition on lesser-included offense instructions. On appeal, the defendant attacked the prohibition on lesser-included offense instructions in capital cases as unconstitutional. The Alabama Court of Criminal Appeals rejected the defendant's argument.  In an opinion denying review, the Alabama Supreme Court also rejected the defendant's argument. The United States Supreme Court granted *certiorari* and reversed the judgment of the Alabama Supreme Court, holding that the death penalty may not "be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck v. Alabama*, 447 U.S. at 627, 637-38. The Supreme Court also held that in capital cases due process requires a state court to give a lesser-included offense instruction "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction." *Id.* at 638. In so holding, the Supreme Court stated in pertinent part:

> While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when

the evidence unquestionably establishes that the defendant is guilty of a
serious, violent offense - - but leaves some doubt with respect to an
element that would justify conviction of a capital offense - - the failure to
give the jury the "third option" of convicting on a lesser included offense
would seem inevitably to enhance the risk of an unwarranted conviction.
Such a risk cannot be tolerated in a case in which the defendant's life is
at stake. As we have often stated, there is a significant constitutional
difference between the death penalty and lesser punishments. . . . To
insure that the death penalty is indeed imposed on the basis of "reason
rather than caprice or emotion," we have invalidated procedural rules that
tended to diminish the reliability of the sentencing determination.  The
same reasoning must apply to rules that diminish the reliability of the guilt
determination. Thus, if the unavailability of a lesser included offense
instruction enhances the risk of an unwarranted conviction, Alabama is
constitutionally prohibited from withdrawing that option from the jury in a
capital case.

*Id.* at 637-38.

The Supreme Court expressly left open the question of whether due process

requires lesser-included offense instructions in non-capital cases. *Id.* at 638 n. 14.

First, it is doubtful that *Beck* is applicable in this case since Petitioner has been

re-sentenced to life imprisonment without parole. *Cf. Pitts v. Lockhart*, 911 F.2d 109,

112 (8th Cir. 1990) (where a defendant receives a life sentence instead of the death

penalty, the case should be treated as a non-capital case for the purpose of due

process); *Creel v. Johnson*, 162 F.3d 385, 390 (5th Cir. 1998) (where a defendant

faces capital charges, but is ultimately sentenced to life imprisonment, the case is

classified as a non-capital case for *Beck* purposes). The Eighth Circuit has held that

"the failure to give a lesser included offense instruction in a non-capital case rarely, if

ever, presents a constitutional question." *Pitts*, 911 F.2d at 112; *Turner v. Armontrout*,

922 F.2d 492, 494 (8th Cir. 1991); *Green v. Groose*, 959 F.2d 708, 709 (8th Cir. 1992).

Other federal Courts of Appeals have held that the failure of a state court to instruct on

a lesser-included offense in a non-capital case does not raise a federal constitutional question. *See, e.g., Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir. 1988); *Perry v. Smith*, 810 F.2d 1078, 1080 (11th Cir. 1987).

Assuming that this case is a capital case for *Beck* purposes, Petitioner is not entitled to relief based upon the trial court's failure to instruct the jury on second-degree murder in light of the United States Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624 (1991).

In *Schad*, the defendant was tried on the charge of premeditated murder as well as the charge of murder committed in an attempt to commit robbery, either of which, under the trial court's instructions to the jury, would constitute first-degree murder. The defense, contending that the circumstantial evidence proved, at most, that the defendant was a thief, requested an instruction on the lesser-included offense of theft. The trial court refused to give an instruction on theft, but did instruct the jury on the lesser-included offense of second-degree murder. The jury returned a verdict of first-degree murder, and the trial judge sentenced the defendant to death. On appeal, the Arizona Supreme Court rejected the defendant's argument that *Beck* required an instruction on the lesser-included offense of robbery. The United States Supreme Court granted *certiorari*. The defendant argued to the Supreme Court that under *Beck* he was entitled to a jury instruction on the offense of robbery, which he characterized as a lesser-included offense of "robbery murder." The United States Supreme Court found that "[u]nlike the jury in *Beck*, the jury here was given the option of finding [the

defendant] guilty of a lesser included non-capital offense, second-degree murder."

*Schad*, 501 U.S. at 645-46. The Court found that while the defendant "cannot,

therefore, succeed under the strict holding of *Beck*, he contends that the due process

principles underlying *Beck* require that the jury in a capital case be instructed on every

lesser included noncapital offense supported by the evidence, and that robbery was

such an offense in this case." *Id.* at 646.  In rejecting the defendant's contention, the

Supreme Court found as follows:

> Petitioner misapprehends the conceptual underpinnings of *Beck*. Our
> fundamental concern in *Beck* was that a jury convinced that the
> defendant had committed some violent crime but not convinced that he
> was guilty of a capital crime might nonetheless vote for a capital
> conviction if the only alternative was to set the defendant free with no
> punishment at all. . . . We repeatedly stressed the all-or-nothing nature
> of the decision with which the jury was presented (citations omitted). As
> we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 82 L. Ed.
> 2d 340, 104 S. Ct. 3154 (1984), "[t]he absence of a lesser included
> offense instruction increases the risk that the jury will convict . . . simply
> to avoid setting the defendant free. . . . The goal of the *Beck* rule, in other
> words, is to eliminate the distortion of the factfinding process that is
> created when the jury is forced into an all-or-nothing choice between
> capital murder and innocence." *See also Hopper v. Evans*, 456 U.S. 605,
> 609, 72 L. Ed. 2d 367, 102 S. Ct. 2049 (1982). This central concern of
> *Beck* simply is not implicated in the present case, for petitioner's jury was
> not faced with an all-or-nothing choice between the offense of conviction
> (capital murder) and innocence.
>
> Petitioner makes much of the fact that the theory of his defense at trial
> was not that he murdered Mr. Grove without premeditation (which would
> have supported a second-degree murder conviction), but that, despite his
> possession of some of Mr. Grove's property, someone else had
> committed the murder (which would have supported a theft or robbery
> conviction, but not second-degree murder). Petitioner contends that if the
> jurors had accepted his theory, they would have thought him guilty of
> robbery and innocent of murder, but would have been unable to return a
> verdict that expressed that view. Because *Beck* was based on this Court's
> concern about "rules that diminish the reliability of the guilt determination"
> in capital cases, 447 U.S. at 638, the argument runs, the jurors should

have been given the opportunity "to return a verdict in conformity with their reasonable view of the evidence." Reply Brief for Petitioner 8. The dissent makes a similar argument. *Post*, at 660.

The argument is unavailing, because the fact that the jury's "third option" was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict. To accept the contention advanced by petitioner and the dissent, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second-degree murder instruction in this case sufficed to ensure the verdict's reliability.

That is not to suggest that *Beck* would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence. *Cf. Roberts v. Louisiana*, 428 U.S. 325, 334-335, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976) (plurality opinion). In the present case, however, petitioner concedes that the evidence would have supported a second-degree murder conviction, Brief for Petitioner 18-19, and that is adequate to indicate that the verdict of capital murder represented no impermissible choice.

*Schad*, 501 U.S. at 646-48.

In the case at bar, the trial judge instructed the jury on capital murder,[14] as well as on the lesser-included offense of first-degree murder, a non-capital offense.[15] Tr. 1761-1763. The defense tendered an instruction on the lesser-included non-capital

---

[14] The instruction stated in pertinent part: To sustain the charge of capital murder, "the State must prove the following things beyond a reasonable doubt: That with the premeditated and deliberate purpose of causing the death of any person, James Fudge caused the death of Kimberly Fudge."  Tr. 1761.

[15] The instruction stated in pertinent part: To sustain the charge of murder in the first degree, "the State must prove beyond a reasonable doubt: That with the purpose of causing the death Kimberly Fudge, James Fudge caused the death of Kimberly Fudge." Tr. 1762.

offense of second-degree murder,[16] but the trial court refused to give the instruction.

Tr. 1752. The jury returned a verdict of capital murder. Because the trial court instructed

the jury on the lesser-included non-capital offense of first-degree murder, which had

support in the evidence, "the central concern of *Beck* is not implicated, for [P]etitioner's

jury was not faced with an all-or-nothing choice between the offense of conviction

(capital murder) and innocence." *Schad*, 501 U.S. at 647; *Six v. Delo*, 94 F.3d 469, 478

(8th Cir. 1996) (finding that under *Schad* the trial judge "need only give the jury a

supported alternative to the all-or-nothing choice of capital conviction or acquittal" and

holding that where the trial judge instructed the jury on first-degree murder, a capital

offense, and the lesser-included offense of conventional second-degree murder, but

refused to instruct the jury on second-degree felony murder as a lesser-included

offense of first-degree murder, the defendant's Fourteenth Amendment rights were not

violated because "the jury was given the option of convicting [the defendant] of a lesser-

included offense with support in the evidence"); *Montoya v. Collins*, 955 F.2d 279, 285

(5th Cir. 1992) (holding that where the trial judge instructed the jury on capital murder

and the lesser-included offense of negligent homicide, but refused to instruct the jury

on the lesser-included offense of involuntary manslaughter, "the central concern of

*Beck* is simply not implicated . . ., for [defendant's] jury was not faced with an all-or-

nothing choice between the offense of conviction (capital murder) and innocence").

Accordingly, the due process clause was not violated by the trial court's refusal to

---

[16] The tendered instruction stated in pertinent part: "To sustain the charge of Murder in the Second Degree, the State must prove beyond a reasonable doubt that: James Fudge knowingly caused the death of Kimberly Fudge under circumstances manifesting extreme indifference to the value of human life."  Tr. 1752.

instruct the jury on the lesser-included offense of second-degree murder. *Schad*, 501 U.S. at 647-48.

### 4. Claim 4: Sufficiency of the Evidence to Support Petitioner's Capital Murder Conviction.

In Claim 4, Petitioner argues that the evidence was insufficient to support his capital murder conviction. The Magistrate Judge liberally construes this claim as a due process challenge to the sufficiency of the evidence to support his conviction.

At trial, Petitioner's counsel moved for a directed verdict at the close of the State's case and at the close of the evidence, arguing that the evidence was insufficient to support a verdict on the charge of capital murder. Tr. 1706, 1740. The trial court summarily denied Petitioner's motions for directed verdict. Tr. 1708, 1741. On direct appeal, Petitioner's counsel argued that the evidence was insufficient to support Petitioner's conviction for capital murder, but did not expressly raise a constitutional challenge to the sufficiency of the evidence to support his conviction. Exhibit C to Respondent's Response (docket entry # 16), pp. 371-374. The Arkansas Supreme Court rejected Petitioner's sufficiency of the evidence claim, concluding that evidence was sufficient to support his conviction for capital murder. *Fudge v. State*, 341 Ark. at 762-66, 20 S.W.3d at 316-19. In so doing, the Arkansas Supreme Court did not cite the Constitution or federal case law.  The Eighth Circuit has held that, for procedural default purposes, "any challenge to the sufficiency of the evidence to conviction in a state prosecution is necessarily a due process challenge to the conviction." *Satter v. Leapley*, 977 F.2d 1259, 1262 (8th Cir. 1992). However, the Eighth Circuit also has acknowledged that the standard used for determining whether the evidence is sufficient

to support a conviction under state law is "arguably different than the due-process standard enunciated" in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Nance v. Norris*, 392 F.3d 284, 289 (8th Cir. 2004).

Under *Satter*, Petitioner's challenge on direct appeal to the sufficiency of the evidence to support his capital murder conviction was, for procedural default purposes, necessarily a due process challenge to the conviction. Nevertheless, the Arkansas Supreme Court did not expressly adjudicate a due process challenge to the sufficiency of the evidence to support Petitioner's conviction for capital murder, nor did the Court implicitly adjudicate such a challenge as counsel for Petitioner did not make such a challenge in his brief on direct appeal or at trial. Under the circumstances, the Magistrate Judge will not give any deference, pursuant to 28 U.S.C. § 2254(d), to the Arkansas Supreme Court's adjudication of Petitioner's claim that the evidence is insufficient to support his conviction for capital murder. However, the Arkansas Supreme Court's factual findings with respect to the evidence supporting Petitioner's capital murder conviction are "presumed to be correct," and Petitioner has the burden of rebutting the findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Nance*, 392 F.3d at 289. In adjudicating Petitioner's argument that the evidence was insufficient to support his conviction, the Arkansas Supreme Court found as follows:

> On Wednesday, December 24, 1997, Kimberly Fudge attended a Christmas Eve party at the apartment of her upstairs neighbor, Deborah Wilson. During the party, James Fudge came to Deborah's apartment, and told Kimberly that it was time for her to go home. Sometime after that, Deborah went to the Fudges' apartment to ask if she was coming back to the party; she found Kimberly "sitting on the couch, balled up." Kimberly did say, however, that she would be coming back up to the party.
>
> Later that same evening, Kimberly came running to Deborah's apartment,

acting nervous and scared and repeating "We've got to go, we've got to go." She would not immediately tell Deborah what was wrong. The two women picked up Kimberly's children and a friend, Donald Wilson, and went to the house of another friend. While there, Deborah noticed that Kimberly had a cut on her face and bruises on her neck. When she asked what happened, Kimberly told her that Fudge had cut her lip, choked her, and forced her to have sex that night.

On Friday, December 26, Kimberly was again at Deborah's apartment. James came to the door and asked for Kimberly, and Deborah told him he was "wrong for what [he] did" to Kim. James replied, "You know I didn't mean to do that to" her. Kimberly left with her husband that night. Later that evening, Deborah went to their apartment and knocked at the door, but received no answer. She went in the apartment, and saw that the lights were off and the TV was on. She also noticed that Kimberly's car, a black 1987 Chevrolet Celebrity, was gone. That evening was the last time Deborah saw Kimberly or James.

On Saturday, December 27, Kimberly was expected at her mother's house. When she failed to show up, her twelve-year-old daughter, Krystal Wade, called Kimberly's apartment looking for her. James answered the phone, and when Krystal asked for her mother, James told her, "If you are looking for her, you will never find her."

During that weekend, James went to the home of Robert Williams in Hensley and told Williams that he had "cut a dude" in the East End and was going to Redfield to wash the blood off of his car. On Sunday the 28th, he also went to the Pilot Travel Center, a truck stop in Galloway, and told a friend named Jerome Jones that he was looking for a ride to Dallas. On Monday, December 29, James returned to the travel center, driving a black 1987 Chevrolet Celebrity. He told Jerome that his wife had kicked him out and that he was still looking for a ride to Dallas. James offered Jerome the car, saying that he was about four months behind on the payments. Jerome agreed to take the car, and James gave him the keys and left.

Jones called his brother, Carl Jones, who came to the truck stop to pick up the Chevrolet. When Carl got the vehicle home, he found a pair of sandals under the passenger seat, as well as bleach and washing powder in the trunk. He also noticed that the floor mat was in the passenger seat, which was wet. When he removed the mat, he saw a reddish stain on the passenger seat. On Tuesday, December 30, Carl loaned the car to a friend named Larry Tyler for a few days. While Tyler was driving the car, he was pulled over by a North Little Rock police officer, who had noticed the tags were registered to Kimberly Fudge, who

had been reported missing by her mother on Monday, December 29. Tyler returned the car to Carl on Thursday, January 1, 1998.

On January 5, Robert Addey was walking through the woods near Woodson in an area of south Pulaski County less than three-quarters of a mile from Robert Williams's house. Addey noticed a hole in the dirt; as he kicked at the dirt, a foot appeared. He immediately contacted the police, who arrived along with the coroner and uncovered Kimberly's body. She had been stabbed repeatedly and buried face-down in a shallow grave, her hands tied behind her back with the sleeves of her jacket.

An arrest warrant was issued for James on January 7, 1998, and he was eventually located in Portland, Oregon, where he was arrested on January 26. Police detectives questioned him there, and he denied any involvement with Kimberly's murder. According to the story James gave at that time, he and his wife had had consensual sex on Christmas Eve, and afterwards, Kimberly left to go to a party at a friend's apartment. However, James said he was under a restraining order not to stay with his wife in her residence, and she had thrown him out of her apartment on Christmas day, 1997. He said that this was the last time he had seen his wife, and that he left town a day or two later. He denied having any kind of violent altercation with her.

A felony information was filed on February 26, 1998, charging James with capital murder. At James's trial, the prosecution put James's aunt, Lucy Taylor, on the stand, who testified that James owned a white car, but that after Christmas of 1997, she had seen him driving a black car that she thought belonged to Kimberly. Dr. Steven Erickson, Associate Medical Examiner at the State Crime Lab, testified as to the manner and cause of death. He stated that Kimberly had been stabbed repeatedly and suffered some blunt force trauma to the back of the head. She had received three stab wounds to her heart, as well as two that pierced her left lung. She also had two other wounds to her lower chest, one to her stomach and liver, another shallow wound to the mid-abdomen, and three wounds to her right leg. There were also small cuts on her hands, a cut on her chin, a large bruise on the back of her head, and some swelling around her bottom lip and right eye. Although he was unable to pin down an exact time or date or death, Erickson stated that, given the cool weather conditions and the fact that Kimberly had been buried in watery mud, that would be consistent with her  having been killed sometime between December 27 or 28, 1997, and a day or two before she was found on January 5, 1998.

Lisa Channell, a forensic serologist for the State Crime Lab, testified that she recovered blood samples from the interior of the car, and that the

blood spatter pattern indicated that the blood had originated from the front passenger seat. She also noted that the blood had been smeared, as though someone had attempted to clean the interior of the vehicle. Philip Raines, a forensic biologist, testified that a DNA analysis of the blood taken from the car matched Kimberly's (the chances of it being someone else's blood were 17 trillion to one).

Fudge, 341 Ark. at 763-66, 20 S.W.3d at 317-19.

Petitioner has not pointed to any evidence, much less clear and convincing evidence, rebutting the presumption of correctness attached to the Arkansas Supreme Court's factual findings.

In assessing whether there is sufficient evidence to support a conviction, a federal court's scope of review is "extremely limited." *Sera v. Norris*, 400 F.3d 538, 543 (8th Cir. 2005) (quoting *Whitehead v. Dormire*, 340 F.3d 532, 536 (8th Cir. 2003)). "It is not relevant whether [the court] believe[s] that the evidence at trial established guilt beyond a reasonable doubt." *Sera*, 400 F.3d at 543. Rather, under *Jackson v. Virginia* the court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sera*, 400 F.3d at 543 (quoting *Jackson v. Virginia*, 443 U.S. at 318-319); *Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000). "This standard recognizes that it is the province of the fact-finder, not this court, 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Sera*, 400 F.3d at 543 (quoting *Jackson v. Virginia*, 443 U.S. at 318-319). "All conflicting inferences that arise from the historical facts must be resolved in favor of the prosecution." *Nance*, 392 F.3d at 290 (citing *Jackson v. Virginia*, 443 U.S. at 326).

To sustain the charge of capital murder, the State must prove beyond a reasonable doubt that "[w]ith the premeditated and deliberated purpose of causing the death of another person, [the defendant] cause[d] the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997). After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Petitioner, with the premeditated and deliberated purpose of causing the death of Kimberly Fudge, caused her death. The Magistrate Judge recommends that Petitioner's due process claim that the evidence is insufficient to support his conviction for capital murder be dismissed with prejudice.

In support of his due process claim that the evidence is insufficient to support his conviction, Petitioner alleges, *inter alia*, that several State witnesses were coached and committed perjury. To the extent that Petitioner's allegation could be construed as a separate claim that his right to due process was violated because the prosecution used false testimony to convict him, he is not entitled to relief on such a claim. First, such a claim is procedurally defaulted because Petitioner did not raise the claim in state court on direct appeal or pursuant to Rule 37.[17] Second, any claim by Petitioner that his right to due process was violated because the prosecution used false testimony to

---

[17] The Magistrate Judge notes that it appears that a defendant's claim that the State used false testimony to convict him is cognizable not only on direct appeal, but under Rule 37. In *Stephens v. State*, 293 Ark. 231, 737 S.W.2d 147 (1987), a petitioner, in an appeal from the denial of Rule 37 relief, argued that the State knowingly used false testimony to convict him. The Arkansas Supreme Court rejected the claim on the merits. Citing *Napue v. Illinois*, 360 U.S. 264 (1959), the Court found that "the state may not knowingly use false testimony to obtain a conviction even when the testimony goes to the witness' credibility," but concluded that "[t]he record in the case does not support a claim that the state knowingly used false testimony." *Stephens*, 293 Ark. at 235, 737 S.W.2d at 147.

convict him is without merit. Habeas relief on a due process claim that a defendant's conviction was obtained through the prosecution's use of false testimony "is contingent upon a showing that the prosecution knowingly used false testimony." *Pederson v. Fabian*, 491 F.3d 816, 827 (8th Cir. 2007); *Blair v. Armontrout*, 916 F.2d 1310, 1316 (8th Cir. 1990). Petitioner has not pointed to any evidence demonstrating that the prosecution knowingly used false testimony to convict him.[18]

## III.  Recommendation.

THEREFORE, the Magistrate Judge recommends that Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. *§* 2254 be dismissed with prejudice.

Dated this 14th day of January, 2008.

_____ /s/ John F. Forster, Jr. _____
UNITED STATES MAGISTRATE JUDGE

---

[18]  The Magistrate Judge finds that the failure to develop such evidence in state court (to the extent such evidence exists) was due to the lack of diligence of Petitioner's attorneys. The Magistrate Judge further finds that Petitioner has not satisfied the criteria in 28 U.S.C. § 2254(e)(2) with respect to a due process claim that his conviction was obtained through the prosecution's use of false testimony. Accordingly, this Court cannot hold an evidentiary hearing so that Petitioner can develop the factual basis of the claim. *Holland v. Jackson*, 542 U.S. at 652-53.